SCHILB ᴇᴛ ᴀʟ. *v.* KUEBEL ᴇᴛ ᴀʟ.

No. 70–90.   Argued October 12, 1971—Decided December 20, 1971

*John J. O'Toole* argued the cause for appellants. With him on the briefs were *John C. Castanes* and *Cornelius F. Dore.*

*James A. Rooney* argued the cause for appellees *pro hac vice.* With him on the brief were *Robert H. Rice* and *Eugene H. Widman.*

Mr. Justice Blackmun delivered the opinion of the Court.

John Schilb, of Belleville, Illinois, was arrested on January 16, 1969, and charged (a) with leaving the scene of an automobile accident and (b) with obstructing traffic. In order to gain his liberty pending trial, and in accord with the Illinois bail statutes hereinafter described, Schilb deposited $75 in cash with the clerk of the court. This amount was 10% of the aggregate bail fixed on the two charges ($500 on the first and $250 on the second). At his ensuing trial Schilb was acquitted of the charge of leaving the scene, but was convicted of traffic obstruction. When he paid his fine, the amount Schilb had deposited was returned to him decreased, however, by $7.50 retained as "bail bond costs" by the court clerk pursuant to the statute. The amount so retained was 1% of the specified bail and 10% of the amount actually deposited.

Schilb, by this purported state class action against the court clerk, the county, and the county treasurer, at-

tacks the statutory 1% charge on Fourteenth Amendment due process and equal protection grounds.[1] The Circuit Court of St. Clair County upheld the statute and dismissed the complaint. The Supreme Court of Illinois affirmed, with two justices dissenting. 46 Ill. 2d 538, 264 N. E. 2d 377 (1970). We noted probable jurisdiction. 402 U. S. 928 (1971).

## I

The Illinois bail statutes compose Article 110 of the State's Code of Criminal Procedure of 1963, made effective January 1, 1964. This Code complemented Illinois' then new and revised Criminal Code of 1961, made effective January 1, 1962. The work of revision of the theretofore existing statutes was that of a Joint Committee of the Illinois State and Chicago Bar Associations. See 1 Ill. Rev. Stat. 1963, p. 1629.

Prior to 1964 the professional bail bondsman system with all its abuses[2] was in full and odorous bloom in Illinois. Under that system the bail bondsman customarily collected the maximum fee (10% of the amount of the bond) permitted by statute, House Bill No. 734, approved July 17, 1959, Ill. Laws 1959, pp. 1372, 1376, and retained that entire amount even though the accused fully satisfied the conditions of the bond. See *People ex rel. Gendron* v. *Ingram,* 34 Ill. 2d 623, 626, 217 N. E. 2d 803, 805 (1966). Payment of this substantial "premium" was required of the good risk as well as of the bad. The results were that a heavy and irretrievable

---

[1] Schilb also attacked the statute as violative of Art. II, §§ 2 and 19, of the Illinois Constitution of 1870 (now Art. I, §§ 2 and 12, of the State's 1970 Constitution).

[2] See D. Freed & P. Wald, Bail in the United States: 1964, pp. 34–35 (1964); R. Goldfarb, Ransom 92–126 (1965); Bowman, The Illinois Ten Per Cent Bail Deposit Provision, 1965 U. Ill. L. F. 35.

burden fell upon the accused, to the excellent profit of the bondsman, and that professional bondsmen, and not the courts, exercised significant control over the actual workings of the bail system.

One of the stated purposes of the new bail provisions in the 1963 Code was to rectify this offensive situation. The purpose appears to have been accomplished. It is said that the bail bondsman abruptly disappeared in Illinois "due primarily to the success of the ten percent bail deposit provision." Boyle, Bail Under the Judicial Article, 17 De Paul L. Rev. 267, 272 (1968). See Kamin, Bail Administration in Illinois, 53 Ill. B. J. 674, 680 (1965).

## II

Article 110 of the 1963 Code, as it read at the time Schilb was arrested and charged, provided that an eligible accused could obtain pretrial release in one of three ways:

(1) Under § 110–2 he may be released on his personal recognizance.[3]

(2) Under § 110–7 he may execute a bail bond and deposit with the clerk cash equal to only 10% of the bail or $25, whichever is the greater.[4] When bail is made in

---

[3] "§ 110–2. Release on Own Recognizance

"When from all the circumstances the court is of the opinion that the accused will appear as required either before or after conviction the accused may be released on his own recognizance. . . .

"This Section shall be liberally construed to effectuate the purpose of relying upon criminal sanctions instead of financial loss to assure the appearance of the accused."

[4] "§ 110–7. Deposit of Bail Security

"(a) The person for whom bail has been set shall execute the bail bond and deposit with the clerk of the court before which the proceeding is pending a sum of money equal to 10% of the bail, but in no event shall such deposit be less than $25.

. . . . .

"(f) When the conditions of the bail bond have been performed and the accused has been discharged from all obligations in the

this way and the conditions of the bond have been performed, the clerk returns to the accused 90% of the sum deposited. The remaining 10% (1% of the bail) is retained by the clerk "as bail bond costs."

(3) Under § 110–8 he may execute a bail bond and secure it by a deposit with the clerk of the full amount of the bail in cash, or in stocks and bonds authorized for trust funds in Illinois, or by unencumbered nonexempt Illinois real estate worth double the amount of the bail.[5] When bail is made in this way and the conditions of

---

cause the clerk of the court shall return to the accused 90% of the sum which had been deposited and shall retain as bail bond costs 10% of the amount deposited."

Section 110–7 (f) was amended in 1969 by Pub. Act 76–1195, approved Sept. 4, 1969, by Pub. Act 76–1394, approved Sept. 19, 1969, and by Pub. Act 76–1801, approved Oct. 9, 1969. It was further amended in 1970 by Pub. Act 76–2078, approved June 22, 1970, and now reads:

"(f) When the conditions of the bail bond have been performed and the accused has been discharged from all obligations in the cause the clerk of the court shall return to the accused, unless the court orders otherwise, 90% of the sum which had been deposited and shall retain as bail bond costs 10% of the amount deposited. However, in no event shall the amount retained by the clerk as bail bond costs be less than $5.

"At the request of the defendant the court may order such 90% of defendant's bail deposit, or whatever amount repayable to defendant from such deposit, to be paid to defendant's attorney of record."

[5] "§ 110–8. Cash, Stocks, Bonds and Real Estate as Security for Bail

"(a) In lieu of the bail deposit provided for in Section 110–7 of this Code any person for whom bail has been set may execute the bail bond with or without sureties which bond may be secured:

"(1) By a deposit, with the clerk of the court, of an amount equal to the required bail, of cash, or stocks and bonds in which trustees are authorized to invest trust funds under the laws of this State; or

"(2) By real estate situated in this State with unencumbered

the bond have been performed, the clerk returns the deposit of cash or stocks or bonds, or releases the real estate, as the case may be, without charge or retention of any amount.

In each case bail is fixed by a judicial officer. Section 110–5 prescribes factors to be considered in fixing the amount of bail.[6] Under § 110–6 either the State or the defendant may apply to the court for an increase or for a reduction in the amount of bail or for alteration of the bond's conditions.[7]

The choice between § 110–7 and § 110–8 is reserved to the accused.

The thinking and intentions of the Joint Committee revisers are apparent from the Committee's comments, as revised by its Chairman, Professor Charles H. Bowman,

---

equity not exempt owned by the accused or sureties worth double the amount of bail set in the bond.

.　　.　　.　　.　　.

"(f) When the conditions of the bail bond have been performed and the accused has been discharged from his obligations in the cause, the clerk of the court shall return to him or his sureties the deposit of any cash, stocks or bonds. If the bail bond has been secured by real estate the clerk of the court shall forthwith notify in writing the registrar of titles or recorder of deeds and the lien of the bail bond on the real estate shall be discharged."

[6] "§ 110–5. Determining the Amount of Bail

"(a) The amount of bail shall be:

"(1) Sufficient to assure compliance with the conditions set forth in the bail bond;

"(2) Not oppressive;

"(3) Commensurate with the nature of the offense charged;

"(4) Considerate of the past criminal acts and conduct of the defendant;

"(5) Considerate of the financial ability of the accused."

[7] "§ 110–6. Reduction or Increase of Bail

"(a) Upon application by the State or the defendant the court before which the proceeding is pending may increase or reduce the amount of bail or may alter the conditions of the bail bond."

and reproduced in Ill. Ann. Stat., c. 38 (Smith-Hurd ed. 1970).[8]

The parties have stipulated that when bail in a particular case is fixed, the judge's "discretion in such respect

[8] ". . . The provisions of sections 110–7 and 110–8 were designed to severely restrict the activities of professional bail bondsmen and to reduce the cost of liberty to arrested persons awaiting trial. . . ." P. 298.

"The committee realized full well the many arguments advanced in opposition to changing the present system. We were not impressed with any of them. If a person can pay a professional bondsman ten per cent of the bail amount as a fee, he can deposit it with the clerk. At the present time he receives nothing back from the bondsman if he appears for trial; his ten per cent fee is gone. Under the provisions of [§ 110–7 (f)] he gets back ninety per cent of the amount deposited if he appears. The ten per cent of the deposit retained by the county will offset in monetary amount the costs of handling bail bonds (which must be done now anyway), and any loss resulting from the occasional bail jumper where the professional bondsman might now forfeit the amount of the bail. . . ." P. 300.

"This section [§ 110–7] is new and provides the procedure for depositing ten per cent of the amount of bail as security for appearance. However, the bail bond will provide for forfeiture of the full amount of the bail upon non-appearance. In addition, the accused would be subject to the penal provisions for bail jumping. However, subsection (f) provides for a return of ninety per cent of the bail deposit (which amounts to [retention of] one per cent of the amount of bail set by the court in the first instance) to the accused upon compliance with the conditions of the bail bond. The ten per cent of the deposit retained by the clerk is to cover costs of handling bail bonds and deposits." P. 316.

"There is nothing in Article 110 which is intended to work any additional hardship on anyone in the giving of bail. It is designed to permit the continuation of present practices in regard to sheriffs, police officers, etc., taking cash bail or drivers' licenses, and to simplify the procedures in all other cases so as to lessen the ultimate cost of bail to offenders (by thousands of dollars each year) who appear for trial anyway, and to assure to the counties in every case a reasonable amount (one per cent of the total amount of bail set) to cover the cost of time and paper-work involved in handling bail cases." P. 324.

is not guided by statute, rule of court or any definite, fixed standard; various and divers judges in fact fix the amount of bail for the same types of offenses at various and divers amounts, without relationship as to guilt or innocence of the particular defendant in a criminal charge, and without relationship of the particular offense charged and the bail fixed." They have also stipulated, "The actual cost of administering the provisions of said Sections 110–7 and 110–8 are substantially the same but there may probably be a slightly greater cost in the administration of Section 110–8."

## III

The Court more than once has said that state legislative reform by way of classification is not to be invalidated merely because the legislature moves one step at a time. "The prohibition of the Equal Protection Clause goes no further than the invidious discrimination." *Williamson* v. *Lee Optical Co.*, 348 U. S. 483, 489 (1955). "Legislatures are presumed to have acted constitutionally . . . and their statutory classifications will be set aside only if no grounds can be conceived to justify them. . . . With this much discretion, a legislature traditionally has been allowed to take reform 'one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.'" *McDonald* v. *Board of Election Commissioners*, 394 U. S. 802, 809 (1969). The measure of equal protection has been described variously as whether "the distinctions drawn have some basis in practical experience," *South Carolina* v. *Katzenbach*, 383 U. S. 301, 331 (1966), or whether the legislature's action falls short of "the invidious discrimination," *Williamson* v. *Lee Optical Co.*, 348 U. S., at 489, or whether "any state of facts reasonably may be conceived to justify" the statutory discrimination, *McGowan* v. *Maryland*, 366 U. S. 420, 426 (1961); see

*United States* v. *Maryland Savings-Share Ins. Corp.,* 400 U. S. 4, 6 (1970), or whether the classification is "on the basis of criteria wholly unrelated to the objective of [the] statute," *Reed* v. *Reed, ante,* p. 71, at 76. But the Court also has refined this traditional test and has said that a statutory classification based upon suspect criteria or affecting "fundamental rights" will encounter equal protection difficulties unless justified by a *"compelling* governmental interest." *Shapiro* v. *Thompson,* 394 U. S. 618, 634, 638 (1969); *Oregon* v. *Mitchell,* 400 U. S. 112, 247 n. 30 (1970) (opinion of BRENNAN, WHITE, and MARSHALL, JJ.).

Bail, of course, is basic to our system of law, *Stack* v. *Boyle,* 342 U. S. 1 (1951); *Herzog* v. *United States,* 75 S. Ct. 349, 351, 99 L. Ed. 1299, 1301 (1955) (opinion of DOUGLAS, J.), and the Eighth Amendment's proscription of excessive bail has been assumed to have application to the States through the Fourteenth Amendment. *Pilkinton* v. *Circuit Court,* 324 F. 2d 45, 46 (CA8 1963); see *Robinson* v. *California,* 370 U. S. 660, 666 (1962), and *id.,* at 675 (DOUGLAS, J., concurring). But we are not at all concerned here with any fundamental right to bail or with any Eighth Amendment-Fourteenth Amendment question of bail excessiveness. Our concern, instead, is with the 1% cost-retention provision. This smacks of administrative detail and of procedure and is hardly to be classified as a "fundamental" right or as based upon any suspect criterion. The applicable measure, therefore, must be the traditional one: Is the distinction drawn by the statutes invidious and without rational basis? *Dandridge* v. *Williams,* 397 U. S. 471, 483–487 (1970). See *Richardson* v. *Belcher, ante,* p. 78, at 81.

## IV

With this background, we turn to the appellants' primary argument. It is threefold: (1) that the 1% reten-

tion charge under § 110–7 (f) is imposed on only one segment of the class gaining pretrial release; (2) that it is imposed on the poor and nonaffluent and not on the rich and affluent;[9] and (3) that its imposition with respect to an accused found innocent amounts to a court cost assessed against the not-guilty person.

We are compelled to note preliminarily that the attack on the Illinois bail statutes, in a very distinct sense, is paradoxical. The benefits of the new system, as compared with the old, are conceded.[10] And the appellants recognize that under the pre-1964 system Schilb's particular bail bond cost would have been 10% of his bail, or $75; that this premium price for his pretrial freedom, once paid, was irretrievable; and that, if he could not have raised the $75, he would have been consigned to jail until his trial. Thus, under the old system the cost of Schilb's pretrial freedom was $75, but under the new it was only $7.50. While acknowledging this obvious benefit of the statutory reform, Schilb and his coappellants decry the classification the statutes make and present the usual argument that the legislation must be struck down because it does not reform enough.

---

[9] Schilb has neither alleged nor shown that he is indigent or that he applied for and was denied release on his personal recognizance. No question of standing, however, was raised in the Illinois courts or here. The Illinois Supreme Court found it unnecessary to pass upon the propriety of the class action. 46 Ill. 2d, at 552, 264 N. E. 2d, at 384.

[10] "QUESTION: Mr. O'Toole [counsel for appellants], [if] you prevail here, do you anticipate the old bond[s]man system will be revised?

"MR. O'TOOLE: Oh no, your Honor . . . that is the furthest thing—we want to make that eminently clear. We believe this to be very good legislation. We feel this aspect of it is wrong. Definitely not, there would not be any reincarnation of the bondsman." Tr. of Oral Arg. 11.

A. It is true that no charge is made to the accused who is released on his personal recognizance. We are advised, however, that this was also true under the old (pre-1964) system and that "Illinois has never charged people out on recognizance." [11] Thus, the burden on the State with respect to a personal recognizance is no more under the new system than what the State had assumed under the old. Also, with a recognizance, there is nothing the State holds for safekeeping, with resulting responsibility and additional paperwork. All this provides a rational basis for distinguishing between the personal recognizance and the deposit situations.

There is also, however, no retention charge to the accused who deposits the full amount of cash bail or securities or real estate. Yet the administrative cost attendant upon the 10% deposit and that upon the full deposit are, by the stipulation, "substantially the same" with, indeed, any higher cost incurred with respect to the full deposit.

This perhaps is a more tenuous distinction, but we cannot conclude that it is constitutionally vulnerable. One who deposits securities or encumbers his real estate precludes the use of that property for other purposes. And one who deposits the full amount of his bail in cash is dispossessed of a productive asset throughout the period of the deposit; presumably, at least, its interim possession by the State accrues to the benefit of the State. Further, the State's protection against the expenses that inevitably are incurred when bail is jumped is greater when 100% cash or securities or real estate is deposited or obligated than when only 10% of the bail amount is advanced. The Joint Committee's and the State Legislature's decision in balancing these opposing considerations in the way that they did cannot be de-

[11] Tr. of Oral Arg. 27.

scribed as lacking in rationality to the point where equal protection considerations require that they be struck down.

*Rinaldi* v. *Yeager,* 384 U. S. 305 (1966), lends no support to the appellants here. In that case a New Jersey statute imposed the cost of a transcript upon the indigent appellant who had been convicted of a crime and was sentenced to prison and who then was unsuccessful on his appeal. The statute, however, did not impose that cost upon the indigent appellant who likewise was convicted of a crime, and was unsuccessful on his appeal, but who had received a suspended sentence or who had been placed on probation or who had been fined rather than sentenced to prison. The distinction the New Jersey statute drew between appellants was based only upon the nature of their punishment, and the burden was imposed only upon those who were confined. The Court held, and rightly so, that a punishment distinction had no rational connection with a transcript cost and served to deny equal protection to the convicted appellant whose liberty was at issue on the appeal. MR. JUSTICE STEWART, in speaking for the Court, said,

"The Equal Protection Clause requires more of a state law than nondiscriminatory application within the class it establishes. It also imposes a requirement of some rationality in the nature of the class singled out. To be sure, the constitutional demand is not a demand that a statute necessarily apply equally to all persons. 'The Constitution does not require things which are different in fact . . . to be treated in law as though they were the same.' Hence, legislation may impose special burdens upon defined classes in order to achieve permissible ends. But the Equal Protection Clause does require that, in defining a class subject to legislation, the distinctions that are drawn have

'some relevance to the purpose for which the classi-
fication is made.' " 384 U. S., at 308–309 (citations
omitted).

The New Jersey distinction thus was invidious and with-
out rationality for it was not related to the fiscal objec-
tives of the statute and rested on no administrative
convenience.

B. The poor-man-affluent-man argument centers, of
course, in *Griffin* v. *Illinois*, 351 U. S. 12 (1956), and in
the many later cases that "reaffirm allegiance to the
basic command that justice be applied equally to all
persons." *Williams* v. *Illinois*, 399 U. S. 235, 241 (1970).

In no way do we withdraw today from the *Griffin*
principle. That remains steadfast. But it is by no
means certain, as the appellants suggest, that the 10%
deposit provision under § 110–7 is a provision for the
benefit of the poor and the less affluent and that the
full-deposit provision of § 110–8 is one for the rich and
the more affluent. It should be obvious that the poor
man's real hope and avenue for relief is the personal
recognizance provision of § 110–2. We do not presume
to say, as the appellants in their brief intimate,[12] that
§ 110–2 is not utilized by Illinois judges and made avail-
able for the poor and the less affluent.

Neither is it assured, as the appellants also suggest,
that the affluent will take advantage of the full-deposit
provision of § 110–8, with no retention charge, and that
the less affluent are relegated to the 10% deposit provi-
sion of § 110–7 and the 1% retention charge. The
record is silent, but the flow indeed may be the other
way. The affluent, more aware of and more experienced
in the marketplace, may see the advantage, in these days

---

[12] "Thus, those least able to afford it, the poor and non-affluent,
who have no choice but to remain in jail or deposit 10% of bail,
are unconstitutionally 'penalized in a quest for justice due to a lack
of wealth.' " Brief for Appellants 16.

of high interest rates, in retaining the use of 90% of the bail amount. A 5% or greater return on this 90% in a short period of time more than offsets the 1% retention charge. In other words, it is by no means clear that the route of § 110–8 is more attractive to the affluent defendant than the § 110–7 route. The situation, therefore, wholly apart from the fact that appellant Schilb himself has not pleaded indigency, is not one where we may assume that the Illinois plan works to deny relief to the poor man merely because of his poverty.

C. The court-cost argument is that the person found innocent but already "put to the expense, disgrace and anguish of a trial" is "then assessed a cost for exercising his right to release pending trial." [13]  *Giaccio* v. *Pennsylvania,* 382 U. S. 399 (1966), is cited.  *Giaccio* was a holding that an ancient Pennsylvania statute that permitted the jury to impose court costs upon an acquitted defendant, in order to offset the expenses of prosecution, violated the Due Process Clause because of vagueness and the absence of any standards preventing the arbitrary imposition of costs.  The Court thus did not reach the merits, although MR. JUSTICE STEWART and Mr. Justice Fortas, each separately concurring, 382 U. S., at 405, felt that the very imposition of costs upon an acquitted defendant was violative of due process.

*Giaccio* is not dispositive precedent for the appellants here.  Certainly § 110–7 is not subject to attack for vagueness or for lack of standards.  Neither is it a vehicle for the imposition of costs of prosecution as was the Pennsylvania statute.  Instead, § 110–7 authorizes retention of the 1% as "bail bond costs."  This is what that description implies, namely, an administrative cost imposed upon all those, guilty and innocent alike, who

---

[13] Brief for Appellants 16.

seek the benefit of § 110–7. This conclusion is supported by the presence of the long-established Illinois rule against the imposition of costs of prosecution upon an acquitted or discharged criminal defendant, *Wells* v. *McCullock,* 13 Ill. 606 (1852), and by the Illinois court's own determination, 46 Ill. 2d, at 551–552, 264 N. E. 2d, at 384, that the charge under § 110–7 (f) is an administrative fee and not a cost of prosecution imposed under Ill. Rev. Stat., c. 38, § 180–3 (1969), only upon the convicted defendant.

## V

Finally, the appellants would point out that Article 110 has its federal counterpart in § 3 (a) of the Bail Reform Act of 1966, Pub. L. 89–465, 89th Cong., 2d Sess., 80 Stat. 214, and in particular in that portion now codified as 18 U. S. C. § 3146 (a)(3). They note that S. 2840, 88th Cong., 2d Sess., contained a 1% retention provision "to defray bail bond costs" but that a parallel bill, S. 1357, 89th Cong., 1st Sess., as it progressed through Congress, at no time had a provision of that kind. It was S. 1357 that was enacted as Pub. L. 89–465.

The committee reports, S. Rep. No. 750, 89th Cong., 1st Sess., and H. R. Rep. No. 1541, 89th Cong., 2d Sess., accompanying the 1966 Act, and the debates, 112 Cong. Rec. 12488–12504, 12841–12843, make no reference to this change from the earlier S. 2840. In the face of this silence, and without more, and being cognizant of the fact that the federal act, unlike the Illinois one, was not directed against the professional bail bondsman, we are not inclined to read constitutional implications into the absence of the retention provision in the Bail Reform Act of 1966.

Neither are we inclined to read constitutional implications into either the presence or the absence of a

retention provision in corresponding statutes of States other than Illinois. See N. Y. Laws 1936, c. 518, N. Y. Code Crim. Proc. § 586.3 (Supp. 1970–1971), having a 2% fee provision, now replaced by §§ 520.10–520.30 of New York's new Criminal Procedure Law, effective September 1, 1971, without the provision. See Wis. Stat. §§ 969.02 (5) and 969.03 (1)(c) (1969), where a 1% fee is specified but not upon dismissal or acquittal. See Alaska Stat. § 12.30.020 (b)(4) (Supp. 1971); D. C. Code Ann. § 23–1321 (a)(3) (Supp. 1971); and Iowa Code Ann. § 763.16.1c. (Supp. 1971), in each of which a 10% deposit is authorized with no fee-retention provision.

## VI

We refrain from nullifying this Illinois statute that, with its companion sections, has brought reform and needed relief to the State's bail system. The judgment of the Supreme Court of Illinois is

*Affirmed.*

MR. JUSTICE MARSHALL, concurring.

I join the opinion of the Court with a few additional words.

All agree that the central purpose of the statute was to restrict severely the activities of professional bail bondsmen who had customarily collected 10% of the amount of each bond as a fee and retained all of it regardless of what happened. All agree that the new scheme is, in general, an admirable attempt to reduce the cost of liberty for those awaiting trial.

The new scheme dealt only with the class of which appellant Schilb was a member—those persons charged with crimes who under the old system were relegated to professional bondsmen who along with other requirements charged a 10% fee for the bond regardless of

the outcome of the case. This is the only class affected by the new scheme. Members of this class now pay 1% instead of 10%. In the evolving struggle for meaningful bail reform I cannot find the present Illinois move toward that objective to be unconstitutional.

MR. JUSTICE DOUGLAS, dissenting.

Appellant John Schilb brought this class action on behalf of all criminal defendants against whom the Clerk of the Circuit Court of St. Clair County, Illinois, had assessed fees of 10% of the amounts deposited as bail bonds. At issue was Ill. Ann. Stat., c. 38, § 100–7 (a) (1970), which allowed a defendant to be released from custody upon "deposit with the clerk of the court . . . a sum of money equal to 10% of the bail" which had been set by the court. Appellant challenged, under the Equal Protection and Due Process Clauses of the Fourteenth Amendment, the provision that "the clerk of the court . . . retain as bail bond costs 10% of the amount [so] deposited." *Id.*, at § 110–7 (f). He argued that this was an unconstitutional discrimination because bail bond costs were not imposed upon those who were released on their personal recognizance, *id.*, at § 110–2, or those who deposited cash or other security in the full amount of the bail bond. *Id.*, at § 110–8.

The Circuit Court found the statute constitutional and dismissed the complaint. The Supreme Court of Illinois affirmed the judgment, 46 Ill. 2d 538, 264 N. E. 2d 377; we noted probable jurisdiction, 402 U. S. 928.

The commercial bail bondsman has long been an anathema to the criminal defendant seeking to exercise his right to pretrial release. In theory, courts were to set such amounts and conditions of bonds as were necessary

to secure the appearance of defendants at trial.[1]  Cf. *Stack* v. *Boyle,* 342 U. S. 1 (1951).  Those who did not have the resources to post their own bond were at the mercy of the bondsman who could exact exorbitant fees and unconscionable conditions for acting as surety.[2]  See A. Beeley, The Bail System in Chicago 39 (1927); D. Freed & P. Wald, Bail in the United States: 1964, p. 34 (1964); R. Goldfarb, Ransom 92–126 (1965); Ares & Sturz, Bail and the Indigent Accused, 8 Crime & Delinquency 12 (1962); Boyle, Bail Under the Judicial Article, 17 De Paul L. Rev. 267, 272 (1968); Note, 106 U. Pa. L. Rev. 693 (1958); Note, 102 U. Pa. L. Rev. 1031 (1954).  Criminal defendants often paid more in fees to bondsmen for securing their release than they were later to pay in penalties for their crimes.  Bowman, The Illinois Ten Per Cent Bail Deposit Provision, 1965 U. Ill. L. F. 35, 36.

Moreover, the commercial bond system failed to provide an incentive to the defendant to comply with the

---

[1] A study by the Champaign County Bar Association indicated that bail was often set at a higher amount than necessary to satisfy these objectives:

"Among the bail practices noted in this report were the following: (1) Bonds of $2,000, $3,000, or even $5,000 are fixed in cases where the accused ultimately is fined $50 or less.  (2) Permitting an accused to sign his own bond without sureties is rarely allowed. (3) Personal bonds of local citizens who own property or have been local residents for many years are frequently refused.  (4) Magistrates frequently fix a bond of $1,000 or so for a minor crime, and when the case is transferred a few days later to the County or Circuit Court by the filing of an information the accused must provide a second bond for the same minor crime." Bowman, The Illinois Ten Per Cent Bail Deposit Provision, 1965 U. Ill. L. F. 35.

[2] In 1962 in Cook County, for example, professional bail bondsmen wrote bonds totaling $18,513,965 entitling them to receive $1,851,396 in fees.  These bondsmen, however, paid forfeiture judgments of only $183,938.  *Id.,* at 36.

terms of his bond. Whether or not he appeared at trial, the defendant was unable to recover the fee he had paid to the bondsman. "No refund is or was made by the professional surety to a defendant for his routine compliance with the conditions of his bond." Kamin, Bail Administration in Illinois, 53 Ill. B. J. 674, 678 (1965).

It was in response to the abuses and inequities of the commercial bonding system that Illinois enacted the statutory scheme now under attack.[3] The Supreme Court of Illinois indicated "that the central purpose of the legislature . . . was to severely restrict the activities of professional bail bondsmen who customarily collected 10% of the amount of a bond as a fee which was retained whether or not the conditions of the bond were met by the accused." 46 Ill. 2d, at 544, 264 N. E. 2d, at 380. To accomplish this end, it was only necessary to deal with the class represented by appellant. Those defendants who posted security in the full amount of the bail bond or who were free on their own recognizance stood

---

[3] The primary argument advanced in favor of retaining the commercial bond system was that the professional bondsman would, at his own expense, track down and recapture a defendant who jumped bail. This argument was found by the Illinois Legislature to have only tenuous factual support:

"As to the value of bondsmen being responsible for the appearance of accused and tracking him down and returning him at the bondsman's expense—the facts do not support this as an important factor. While such is accomplished occasionally without expense to the county, the great majority of bail jumpers are apprehended by the police of this and other states. Since bail jumping is now a distinct and separate crime, and with the nation-wide exchange of information between law enforcement agencies and the F. B. I., the average bail jumper has little chance of escape. The facts show that most of them are recaptured in this state, and even in the same county where they are to appear." Committee Comments—1963, Ill. Ann. Stat., c. 38, p. 300 (Smith-Hurd ed. 1970).

in the same financial position under the new statutory scheme as under the old. No costs have ever been imposed upon them and any security deposited has always been returned upon the satisfaction of the terms of the bond.

Those defendants who under the old system had utilized the services of the professional bondsman are now required to post with the clerk of the court 10% of the face amount of their bonds in order to win their release. The significant difference, however, is that upon satisfaction of the terms of their bonds, § 110–7 now allows them to recover 90% of the amount deposited, while no such recovery was ever had from the commercial bondsman. Rather than paying a fee of 10% of the face amount of the bond, therefore, the cost is now only 1%.

Appellant urges that the new system of pretrial release is constitutionally deficient despite the improvement it has wrought. Appellant first argues that § 110–7 imposes costs upon only one class of criminal defendants without any rational basis for the classification. Next he asserts that the poor and nonaffluent, who have no choice but to remain in jail or deposit 10% of bail, are unconstitutionally penalized due to lack of wealth. Finally, he says that § 110–7 violates the Due Process Clause insofar as it allows costs to be taxed against an accused who is ultimately found innocent.

In response, appellees assert that the classification implements the laudable purpose of eliminating the commercial bail bondsman. Under this view, the 1% fee is no more than the interest charged for allowing an accused his freedom upon payment of only 10% of the amount set as bail. Appellees urge that a system which requires liberal use of an accused's release on his own recognizance, Ill. Ann. Stat., c. 38, § 110–2 (1970), and

which reduces to a fraction of the previous cost the financial burden on those required to post cash bonds, actually benefits the indigent.[4]

I do not reach the question of equal protection but rest my decision on the issue stirred, but not decided, in *Giaccio* v. *Pennsylvania,* 382 U. S. 399. The plaintiff in this action, John Schilb, was charged (1) with leaving the scene of an automobile accident and (2) obstructing traffic. He posted a 10% bond on each charge—one for $50 and one for $25; he was acquitted on the first one and was charged $7.50 on the two bonds.

The 1% charge is a part of the cost of a criminal prosecution, imposed even on an innocent person who is accused of a crime and who is put to the expense and anguish of a trial. *Giaccio* involved a state statute which directed juries "in all cases of acquittals" to determine whether the government or the defendant should pay the costs. 382 U. S., at 400–401. We held the Act unconstitutional on grounds of vagueness. MR. JUSTICE STEWART, concurring, said: "In the present case it is enough for me that Pennsylvania allows a jury to punish a defendant after finding him not guilty. That, I think, violates the most rudimentary concept of due process of law." 382 U. S., at 405.

Mr. Justice Fortas also concurred, saying: "In my opinion, the Due Process Clause of the Fourteenth Amendment does not permit a State to impose a penalty or costs upon a defendant whom the jury has found not guilty of any offense with which he has been charged." *Ibid.* That is my view on the merits in the instant case.

---

[4] Appellees note that a major portion of those defendants who avail themselves of the 10% bail provision are not indigent. A wealthy accused who could afford to pay either 10% or 100% of the amount set as bail might well elect to pay only 10% if the 1% cost thereby imposed would be less than the interest which could be earned if the 90% were retained and invested.

Some costs are the unavoidable consequences of a system of government which is required to proceed against its citizens in a public trial in an adversary proceeding. Yet I see no basis for saying that an accused must bear the costs incurred by the Government in its unsuccessful prosecution of him. Imposition of costs upon individuals who have been acquitted has long been eschewed by our courts. *E. g., State* v. *Brooks,* 33 Kan. 708, 715, 7 P. 591, 596 (1885); *Biester* v. *State,* 65 Neb. 276, 91 N. W. 416 (1902); *Childers* v. *Commonwealth,* 171 Va. 456, 198 S. E. 487 (1938). Some jurisdictions have provided that the imposition of costs upon acquitted individuals is reprehensible. See, *e. g.,* Costs in Criminal Cases Act, 15 & 16 Geo. 6 & 1 Eliz. 2, c. 48 (1952); Report of the Attorney General's Committee on Poverty and the Administration of Criminal Justice 31–32 (1963); Goldberg, Equality and Governmental Action, 39 N. Y. U. L. Rev. 205, 223–224 (1964); Note, 1962 Wash. U. L. Q. 76. Where there is such uniform condemnation of a practice as onerous as the imposition of costs upon acquitted defendants, cf. *Leland* v. *Oregon,* 343 U. S. 790, 798 (1952), I would conclude, with JUSTICES STEWART and Fortas in *Giaccio,* that it violates due process.

It is, however, said that the 1% charge is not "a vehicle for the imposition of costs of prosecution" and that it is merely "an administrative cost imposed upon all those, guilty and innocent alike, who seek the benefit of § 110–7." *Ante,* at 370, 370–371. The costs of administering the bail system occur, by definition, only during the course of criminal prosecutions. They are as much an element of the costs of conducting criminal cases as the prosecutor's salary, the fee for docketing an appeal, or the per diem paid to jurors. Nor does the rubric "administrative" require a contrary result. If this were the talisman through which a State could impose its costs upon acquitted defendants, I could see no stopping point

and we might be left with a system in which an acquittal might be nearly as ruinous to the defendant as a conviction.

On the other aspects of the case facts are absent which we would need to know if we are to make an informed judgment on the requirements of equal protection. The discrimination condemned is an "invidious" one, it being recognized over and again that "legislation may impose special burdens upon defined classes in order to achieve permissible ends." *Rinaldi* v. *Yeager*, 384 U. S. 305, 309. The elimination of the professional bondsman seems to me to be a permissible end. The provision for the 10% bond is, in that view, an ameliorating one. The problem on which this record leaves us in the dark is the actual working of that provision and the provision for release on personal recognizance. Not everyone, I assume, is entitled to pretrial release. Equal protection would seem to require that each, whether rich or poor, black or white, is entitled to release on personal recognizance if he meets the requirements of stability, reputation, community ties, and so on. In Illinois the record is silent [5]

---

[5] The Manhattan Bail Project which has been in operation since 1961 deals only with felony defendants:

"In evaluating whether the defendant is a good parole risk, four key factors are considered: (1) residential stability; (2) employment history; (3) family contacts in New York City; and (4) prior criminal record. Each factor is weighted in points. If the defendant scores sufficient points, and can provide an address at which he can be reached, verification will be attempted. Investigation is confined to references cited in the defendant's signed statement of consent." D. Freed & P. Wald, Bail in the United States: 1964, p. 59 (1964).

From 1961 to 1964 out of 13,000 defendants, 10,000 were interviewed, 4,000 were recommended for release on personal recognizance, and 2,195 were paroled. Of these, only 15 failed to show up in court, a default rate less than seven-tenths of one percent.

If Illinois' experience is comparable, it is understandable why those who pass muster on personal recognizance may be treated more

as to how the system of release on personal recognizance, as contrasted to release on the 10% bond, is in fact administered. The manner of administration may, of course, raise serious equal protection questions. For a statute fair on its face may be administered in an invidious way. As stated in *Yick Wo* v. *Hopkins,* 118 U. S. 356, 373–374:

> "Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution."

But, as I have said, the record contains no factual basis showing the manner of administration of the Illinois system.

---

leniently than those who do not qualify for that kind of release. In that connection 60% of those released on personal recognizance in Manhattan were either acquitted or had their cases dismissed, compared with 23% of the others. *Id.,* at 63.

If that were the experience of Illinois, the State certainly could not be charged with making an invidious discrimination against the other group, even though the cost of administering the personal recognizance program was as high as the cost of administering the bail program. Cf. *Richardson* v. *Belcher, ante,* p. 78; *United States* v. *Maryland Savings-Share Ins. Corp.,* 400 U. S. 4 (1970); *McDonald* v. *Board of Election Commissioners,* 394 U. S. 802 (1969); *McGowan* v. *Maryland,* 366 U. S. 420 (1961); *Williamson* v. *Lee Optical Co.,* 348 U. S. 483 (1955); *Metropolis Theatre Co.* v. *City of Chicago,* 228 U. S. 61 (1913). Cost of administration is only one item for comparison. The lessened burden on the State accruing from the few convictions and the resultant jail term sentences is a factor that a State may take into consideration. Certainly if the Illinois experience parallels the Manhattan experience, we would be hard put to say that Illinois shows an invidious discrimination against those who can only make bail as compared with those who are qualified to be released on personal recognizance.

I would reverse this judgment insofar as it imposed bail bond costs under the criminal charges of which members of the class represented by appellant were acquitted and remand for further proceedings respecting the bail bond costs on the charges on which they were convicted.

MR. JUSTICE STEWART, with whom MR. JUSTICE BRENNAN concurs, dissenting.

In 1963, Illinois enacted new provisions governing bail in criminal cases. Ill. Rev. Stat., c. 38, Art. 110 (1963). These enactments provide that a person charged with a criminal offense may obtain pretrial release in one of four ways.

(1) The accused may be released on his own recognizance. Persons in this class do not pay any costs to cover the administration of their release. § 110–2.

(2) The accused may deposit 10% of the full amount of the bail that has been set. § 110–7. When bail is made in this manner, the clerk of the court ultimately retains as bail costs 1% of the full amount of bail (10% of the amount actually deposited). § 110–7 (f).

(3) The accused may offer cash, stocks or bonds in an amount equivalent to the required bail. No administrative costs are imposed. § 110–8 (a)(1).

(4) The accused may secure double the amount of required bail in unencumbered real estate. Again, no administrative costs are imposed. § 110–8 (a)(2) and (f).

A person must satisfy a judge that he meets certain criteria to be eligible for release on his own recognizance. Otherwise the State allows individuals to choose freely among the three other methods of obtaining pretrial release (assuming the individual has the wherewithal to make a choice).

The 1963 bail provisions of the Illinois Criminal Code represented substantial reforms in the State's procedures for granting pretrial release. The central purpose of the legislation was to restrict severely the activities of pro-

fessional bail bondsmen who had customarily collected 10% of the amount of a bond as a fee, which they retained whether or not the conditions of bond were met by the accused.[1]  Before 1963, accused persons who could not obtain release on their own recognizance had no choice but to offer the full amount of the bail that was set.  The primary innovation of bail reform was to create a class of "ten-percenters," persons who could gain release by depositing only 10% of the required bail.

Appellant John Schilb was charged with leaving the scene of an accident and obstructing traffic.  Bail was set at $500 for the first offense and $250 for the second.  As a "ten-percenter," the appellant posted $50 and $25 bonds.  He was found guilty of the second charge and not guilty of the first.  After these judgments were entered, the State retained $5 and $2.50 respectively, as administrative costs on his bonds. ` Subsequently, the appellant brought this class action against the clerk of the Circuit Court of St. Clair County, Illinois, alleging that the cost-retention provision of the state bail law, § 110–7 (f), constitutes a violation of the Equal Protection Clause of the Fourteenth Amendment because administrative costs are imposed only on that class of persons who obtain pretrial release by depositing 10% of the required bail.  The Illinois Supreme Court ultimately upheld the validity of § 110–7 (f), with two

---

[1] Other common abuses perpetuated by the bondsman system were overcharges of bail fees, failure to return security pledges to the owner, and retention of money reimbursements for forfeited bond judgments which were later vacated. D. Freed & P. Wald, Bail in the United States: 1964, p. 34 (1964).  According to the appellees' brief, the Illinois reforms have apparently put an end to the activities of professional bondsmen.  As the Illinois Supreme Court noted: "[T]he ultimate objective of this reform was to regain from professional bondsmen the control of bail releases and restore such control to the courts where it rightfully belongs." 46 Ill. 2d 538, 544, 264 N. E. 2d 377, 380–381 (1970).

justices dissenting. 46 Ill. 2d 538, 264 N. E. 2d 377 (1970).

It is common ground that the Illinois bail reform scheme reflects an admirable attempt to reduce the cost of liberty for those awaiting trial. Chapter 38, § 110–7 (f), does arbitrarily discriminate, however, against the appellant and those similarly situated.[2] As this Court said in *Rinaldi* v. *Yeager*, 384 U. S. 305:

> "The Equal Protection Clause requires more of a state law than nondiscriminatory application within the class it establishes. It also imposes a requirement of some rationality in the nature of the class singled out. . . . [L]egislation may impose special burdens upon defined classes in order to achieve permissible ends. But the Equal Protection Clause does require that, in defining a class subject to legislation, the distinctions that are drawn have 'some relevance to the purpose for which the classification is made.' " *Id.,* at 308–309 (citations omitted).

The Court assumes that the rationality of § 110–7 (f)'s classification should be analyzed in relation to the purpose of ending the evils created by the bail bond system. However, while ending those evils is the aim of the whole bail reform, it is not the aim of § 110–7 (f) itself. Rather, the appellees have acknowledged that the purpose of § 110–7 (f) is to cover administrative costs; they have also acknowledged in oral argument that the financial burden on the State is probably as great or

---

[2] I would decide this case solely on the ground that the provision in question arbitrarily discriminates between like classes of persons. I would not, therefore, reach the two other arguments urged by the appellants: that the provision arbitrarily favors the rich over the poor and that the provision violates due process by imposing costs on those who are ultimately found to be innocent.

greater for those who use the other methods of obtaining pretrial release.[3]   Can the appellees constitutionally justify the selective imposition of administrative costs?[4] I think not.

The Illinois Supreme Court held that there can be no unconstitutional discrimination in the state system of bail release, since each person accused has a choice of method for obtaining pretrial release.   46 Ill. 2d, at

---

[3] As the Court notes, the parties have stipulated that the "actual cost of administering the provisions of said Sections 110–7 and 110–8 are substantially the same but there may probably be a slightly higher cost in the administration of Section 110–8."  With regard to those released on their own recognizance (under § 110–2) and the "ten-percenters," the appellees acknowledged at oral argument that the administration of release for both classes imposes equal costs on the State:

"MR. ROONEY: We think [those released on their own recognizance] are a little differently situated than those——

"QUESTION: Not expense wise to the system?

"MR. ROONEY: Not expense wise to the system . . . ."   Tr. of Oral Arg. 19–20.

[4] The Bail Reform Act of 1966, 18 U. S. C. §§ 3141–3152, a federal law in some ways similar to Illinois' provisions governing bail, provides for "ten-percenters" at the discretion of the judge.   However, it imposes no administrative costs on persons seeking pretrial release through the deposit of something less than the full bail required. 18 U. S. C. § 3146 (a)(3).  Earlier versions of the legislation had imposed an administrative cost of 1% of the total bail required on those who elected to deposit 10%, S. 2840, 88th Cong., 2d Sess. (1964).

Several States allow persons to obtain pretrial release by depositing a sum less than the full amount set for bail.  Two of these, Iowa, Iowa Code Ann. § 763.16.1c (Supp. 1971), and Alaska, Alaska Stat. § 12.30.020 (b)(4) (Supp. 1971), impose no administrative costs.  Wisconsin imposes a cost only on those found guilty, Wis. Stat. § 969.03 (1)(c) (1969).  New York until recently imposed a flat percentage fee on all who obtain pretrial release, regardless of method chosen.  N. Y. Laws 1936, c. 518, and N. Y. Code Crim. Proc. § 586.3 (Supp. 1970–1971).  There is now no fee.  N. Y. Criminal Procedure Law §§ 520.10–520.30.

548, 264 N. E. 2d, at 382. Those who deposit 10%, said the court, "are not automatically placed in this class . . . by the law. They join only by the exercise of their own volition." Whether many persons accused of crimes can really choose between paying 10% or paying the full amount (or securing double the amount in real estate) is highly debatable.[5] But however that may be, it is clear that not every person accused of a crime is free to choose to be released on his own recognizance. Yet those who are fortunate enough to be so released need pay no costs whatever.

The appellees argue that those who pay only 10% are being given a benefit that justifies imposing a burden. The appellees say that such persons are not required to put up the full amount of the bail set and that the 1% such persons do ultimately pay is a boon by comparison to the 10% of required bail that they would have automatically forfeited to the bondsman under the old procedures governing bail. This justification, however, also fails to distinguish between the "ten-percenters" and those who are released on their own recognizance. Obviously, those released on their own recognizance receive an even greater benefit than those who deposit 10%, since they give no money to the State at any time if they meet the conditions of release.[6]

---

[5] The dissent in the Illinois Supreme Court took "judicial notice of the fact that many defendants cannot afford to pay the full amount of the bail." 46 Ill. 2d, at 553, 264 N. E. 2d, at 385. From this basic fact it can be argued that, since many of those accused have no choice but to deposit 10%, the imposition of administrative costs upon that class alone amounts to a violation of the Equal Protection and the Due Process Clauses of the Fourteenth Amendment. *Griffin* v. *Illinois*, 351 U. S. 12.

[6] The appellees contend that those who offer the full amount of bail in cash actually pay an administrative cost because they sacrifice the interest that would accrue on the money. However, this argument totally fails to meet the objection raised with regard to

The appellees attempt to distinguish between those released on their own recognizance and the "ten-per-centers" by noting that the recognizance practice is "historic," whereas the cost-retention provision was recently enacted to end the evils spawned by bail bondsmen.[7] This distinction, however, does not confront the reality that both classes of persons receive benefits and only one class must pay administrative costs. A second attempt to distinguish between those released on their own recognizance and those who deposit 10% turns on the idea that the members of the former class are more "worthy" of the benefit they receive and therefore may rationally be required to pay less. But while the criteria used by judges to determine release on one's own recognizance— *e. g.,* length of residence in the jurisdiction, marital status, employment record, or past criminal record—are obviously relevant to the recognizance decision, they are

those released on their own recognizance. Moreover, those who offer stocks or bonds or who secure property to obtain their release may not, apparently, lose any income that might accrue on those items during the period before trial. The statutory scheme governing bail does not by its terms provide for the State to receive interest, dividends, or rent on stocks or bonds or land. The record before us is silent on the question of Illinois practice with regard to the benefits that flow from those sources of income before trial. Stocks and bonds are deposited with the clerk of the court, but there is no indication that the accused does not continue to receive earnings. Similarly, the accused gives the State first lien on the real estate offered as bond, but there is no indication that the accused is deprived of the use of the land. Ill. Rev. Stat., c. 38, § 110–8 (1963).

[7] The Court refers to a statement made in oral argument that the State of Illinois has never imposed costs on those who obtain release on their own recognizance. But under the rules governing pretrial release that existed before the 1963 reforms, the State did not impose administrative costs on *anyone* obtaining pretrial release. 46 Ill. 2d 538, 264 N. E. 2d 377. The question here is whether the current, selective imposition of administrative costs by the State is constitutional.

not rationally related to the decision to impose purely administrative costs, especially when such costs are at least as great for those released on their own recognizance as for those required to post bond.

Given the infirmities in the asserted justifications for § 110–7 (f), I think the imposition of administrative costs on only one class of those persons seeking pretrial release violates the Equal Protection Clause of the Fourteenth Amendment. Accordingly, I would reverse the judgment before us.