**Charles HABRON et al., Plaintiffs,**

**International Association of Marble, Slate and Stone Polishers, Rubbers and Sawyers, Tile Helpers, and Finishers, Marble Setters Helpers, Marble Mosaic and Terrazzo Workers Helpers, Intervening-Plaintiffs,**

v.

**Harvey A. EPSTEIN, Commissioner of Labor and Industry of the State of Maryland, Defendant,**

**Baltimore Building and Construction Trades Council, Intervening-Defendant.**

**Civ. A. No. N–74–1314.**

United States District Court, D. Maryland.

April 6, 1976.

---

John J. Bishop, Jr., Towson, Md., for plaintiffs and intervening plaintiffs.

Francis B. Burch, Atty. Gen., Robert J. Aumiller and John J. Lucas, Asst. Attys. Gen., Baltimore, Md., for defendant.

Peter G. Angelos and Stephen B. Caplis, Baltimore, Md., for intervening defendant.

Before WINTER, Circuit Judge, NORTHROP, Chief Judge and WATKINS, Senior District Judge.

NORTHROP, Chief Judge.

■ This action comes now before the Court on plaintiffs' prayer for declaratory judgment pursuant to 28 U.S.C. § 2201 (1970) to declare "unconstitutional and contrary to Section 1 of the 14th Amendment of the United States" Section 105A, Article 100 of the Maryland Code, which, summarized, prohibits the use of persons categorized as "helpers" on state construction projects. Md.Ann. Code Art. 100, § 105A (Cum.Supp.1975). Jurisdiction is properly invoked by the complaint under 28 U.S.C. § 1331 (1970), federal question jurisdiction, and also 28 U.S.C. § 1343(3)(4) (1970), the general civil rights authorizing statute, by amended complaint. A three-judge District Court is appropriate for this case pursuant to 28 U.S.C. § 2281 (1970).[1]

---

1. Since the instant action seeks a declaratory judgment declaring Section 105A, a state statute, unconstitutional, convocation of a three-judge court is proper. *See King v. Smith,* 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); *Alabama Public Service Comm'n. v. Southern Ry. Co.,* 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951).

## FACTUAL BACKGROUND

In 1970, the Maryland Legislature enacted a prevailing wage law applicable to all public works projects in Maryland in excess of $500,000. Now codified in Md.Ann.Code Art. 100 § 96 *et seq.* (Cum. Supp.1975). In 1973, the Legislature added to the statute Section 105A, "Employment of Apprentices," the subject of the within controversy. Section 105A, in effect, specifically precluded the use of "helpers"[2] and authorized the use of apprentices[3] on public works projects valued over $500,000. Section 105A mandated that:

No person classified as a helper or trainee shall be employed on public works. Only apprentices in a trade, craft or occupation for which an apprenticeship program has been approved by the apprenticeship and training council of the Department of Licensing and Regulation shall be employed on public works. Each apprentice employed on a public works shall be paid not less than the percentages, as set forth in such approved apprenticeship program, of the journeyman mechanic's prevailing hourly rate of wages as determined by the Commissioner of Labor and Industry for such journeyman mechanic in the trade, craft or occupation in which the apprentice is employed on the public works.

Plaintiffs in this action are persons who are employed, or have been employed, as helpers in Maryland. They claim to be adversely affected by the enforcement of Section 105A. Their complaint states that as a result of the

---

2. Helper has been defined by stipulation as:
A worker who assists another worker, usually of a higher level of competence or expertness, by performing a variety of duties, such as furnishing another worker with materials, tools, and supplies; cleaning work area, machines, and equipment; feeding or off-bearing machine; holding materials or tools; and performing other routine duties. A HELPER may learn a trade but does so on his own without an agreement with his employer that such is the purpose of their relationship. Consequently, the title HELPER is sometimes used as synonym for APPRENTICE, a practice that is incorrect technically. A worker whose duties are limited or restricted to one type of activity, such as moving materials from one department to another, feeding machines, removing products from conveyors or machines, or cleaning machines or work areas is not technically a HELPER and is classified according to duties performed as MATERIAL HANDLER: MACHINE CLEANER: PORTER II. A worker who performs a variety of duties to assist another worker is a HELPER technically and is classified according to worker assisted as BRICKLAYER HELPER (const.); DRY-CLEANER HELPER (clean., dye., & press.).

3. Apprentice has been defined by stipulation as:
A worker who learns, according to a written or oral contractual agreement, a recognized skilled craft or trade requiring two or more years of on-the-job training through job experience supplemented by related instruction, prior to time that he may be considered a qualified skilled worker. APPRENTICES are seldom over 30 years of age. High School or vocational school education is generally a prerequisite for entry into an apprenticeship program. Provisions of apprenticeship agreement regularly include length of apprenticeship; a progressive scale of wages; work processes to be taught; and amount of instruction in subjects related to the craft or trade, such as characteristics of materials used, selected shop mathematics, and blueprint reading. Apprentice-ability of a particular craft or trade is best evidenced by its acceptability for registration as a trade by a State apprenticeship agency or the Federal Bureau of Apprenticeship and Training. Generally, where employees are represented by a union, apprenticeship programs come under the guidance of joint apprenticeship committees composed of representatives of the employers or the employer association and representatives of the employees. These committees may determine need for APPRENTICES in a locality and establish minimum apprenticeship standards of education, experience, and training. In instances where committees do not exist, apprenticeship agreement is made between APPRENTICE and employer, or an employer group. The title, APPRENTICE, is often loosely used as a synonym for beginner, HELPER, or LEARNER. This practice is technically incorrect and leads to confusion in determining what is meant. Typical classifications for APPRENTICES are BLACKSMITH APPRENTICE (forging); MACHINIST APPRENTICE (mach. shop); PLUMBER APPRENTICE (const.).

statute they "will continue to be deprived from working on public works projects of the State of Maryland thereby impairing their ability to earn their livings and support themselves and their families. . . ." Moreover, plaintiffs assert that Section 105A works as "an invidious, arbitrary, unreasonable and unconstitutional discrimination against them . . . [which] deprives them of the equal protection of the laws. . . ." Plaintiffs' Complaint at 4.

Defendants assert that the statute is constitutionally valid since there is a rational basis and compelling state interest to proscribe employment of helpers on public works projects. Defendants aver that "Maryland has the authority consistent with the requirements of the Fourteenth Amendment to regulate an occupation or craft affecting the public interest by establishing qualifications which are reasonably related to insuring the competency of its practitioners within that occupation." Defendants' Answer to Complaint at 2–3.

The matter was heard before this Court on October 20 and 21, 1975. The Court therein received substantial testimony designed to buttress the respective parties' contentions and legal theories.

FINDINGS OF LAW AND FACTS

To properly adjudicate the merits of plaintiffs' allegation of denial of equal protection, this Court must consider three significant questions: (1) What standard should be employed to determine whether the statute in question violates the equal protection clause—the "rational basis" or the "compelling state interest" test? (2) If the "rational basis" standard is invoked, how is it to be defined? and (3) Do the facts as presented in the pleadings and at the trial satisfy the standard?

Recently, when adjudicating allegations of equal protection violations, courts have subjected statutes to two forms of scrutiny—the low scrutiny test or the "rational basis" test and the strict scrutiny test, or the "compelling state interest" test. Of the two tests, the more stringent test has been applied in two situations: those in which the *basis* of the distinction or classification drawn by the state is inherently *suspect*; and those in which the *effect* of the distinction is to impair a person's *fundamental* rights. *See Weber v. Aetna Casualty & Surety Co.,* 406 U.S. 164, 178–81, 92 S.Ct. 1400, 1408–09, 31 L.Ed.2d 768, 780–82 (1972). If the classification in question rests on either inherently suspect grounds or hinders a fundamental right, it will only be sustained if the enactment is shown to promote a compelling state interest. *Cf., Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972). The Supreme Court, over the last few decades, has identified certain classifications as suspect, for example— race, *Hunter v. Erickson,* 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969); *McLaughlin v. State,* 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964); *Korematsu v. United States,* 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944); alienage or national origin, *Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); *Oyama v. State,* 332 U.S. 633, 68 S.Ct. 269, 92 L.Ed. 249 (1948); illegitimacy, *Gomez v. Perez,* 409 U.S. 535, 93 S.Ct. 872, 35 L.Ed.2d 56 (1972); religion, *Sherbert v. Verner,* 373 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); or, in certain instances, wealth, *see James v. Valtierra,* 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971) (Marshall, J., dissenting) [citing numerous cases which held that discrimination between rich and poor *as such* is a suspect classification].

The plaintiffs do not contend, nor do the facts illustrate, a suspect classification under any of the foregoing. However, plaintiffs do argue that the strict standard is applicable to review of Section 105A because of the statute's interference with a "fundamental" right—the right to work. Plaintiffs contend that this Court has been presented a sound basis for employing the compelling state interest test (while conceding that the so-called right to work has never been adjudged fundamental, calling for strict analysis). They reveal this basis in their

Answer to Motion for Summary Judgment, at 2:

> The pursuit of happiness is recognized as a fundamental right to which all citizens are entitled. In today's society, happiness is inexorably related to one's economic status. The right to earn the means by which one pursues happiness can then be said to be fundamental.

■ While this argument is somewhat ingenious, we are not persuaded that this alleged right was ever intended to be, or should be, a fundamental right. Legislation requiring strict scrutiny is envisioned as being more than that which merely affects economics, but is "legislation which involves one of the basic civil rights of man." *Skinner v. State,* 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655, 1660 (1942). The theory derives principally from *Skinner,* where the Supreme Court first spoke of certain rights as being fundamental:

> Marriage and procreation are *fundamental* to the very existence and survival of the race. The power to sterilize, if exercised, may have subtle, far-reaching and devastating effects. In evil or reckless hands it can cause races or types inimical to the dominant group to wither and disappear. . . *strict scrutiny of classification* which a State makes in a sterilization law is essential, lest unwittingly or otherwise invidious discriminations are made against groups or types of individuals in violation of the constitutional guaranty of just and equal laws.

*Id.* (emphasis added). (*See Griswold v. State,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), wherein *not* procreating is declared a fundamental right also.)

Subsequent to *Skinner,* the Court declared other rights to be so fundamental as to require strict scrutiny—voting, *Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); *Evans v. Cornman,* 398 U.S. 419, 90 S.Ct. 1752, 26 L.Ed.2d 370 (1970); *Carrington v. Rash,* 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965); *Harper v. Virginia Bd. of Elections,* 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1964); freedom from incarceration due to indigency, *Tate v. Short,* 401 U.S. 395, 91 S.Ct. 668, 28 L.Ed.2d 130 (1970); right to travel, *Dunn v. Blumstein, supra; Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1968); *United States v. Guest,* 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966); and certain criminal procedures, *cf. Griffin v. Illinois,* 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956).

However, as conceded by the plaintiffs, courts have never seen fit to declare that the right to seek employment, unfettered by government regulation, is fundamental. In fact, courts have consistently *refused* to employ the strict compelling interest standard and opted for the lower scrutiny test for purely economic matters, such as the instant situation. *See e. g., Two-Guys from Harrison-Allentown, Inc. v. McGinley,* 366 U.S. 582, 81 S.Ct. 1135, 6 L.Ed.2d 551 (1960); *Allied Stores of Ohio v. Bowers,* 358 U.S. 522, 528, 79 S.Ct. 437, 441, 3 L.Ed.2d 480, 485 (1959); *Railway Express Agency, Inc. v. New York,* 336 U.S. 106, 110, 69 S.Ct. 463, 465, 93 L.Ed. 533, 538 (1949); *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78–79, 31 S.Ct. 337, 340–41, 55 L.Ed. 369, 377 (1910); *Snell v. Wyman,* 281 F.Supp. 853, 867, *aff'd.,* 393 U.S. 323, 89 S.Ct. 553, 21 L.Ed.2d 511 (1968). Specifically on point with the instant case are numerous cases which applied the rationality test to state legislation restricting the availability of employment opportunities. *Goesaert v. Cleary,* 335 U.S. 464, 69 S.Ct. 198, 93 L.Ed. 163 (1948); *Kotch v. Board of River Port Pilots Com'rs.,* 330 U.S. 552, 67 S.Ct. 910, 91 L.Ed. 1093 (1947). *See also Flemming v. Nestor,* 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1959).

In *Kotch v. Board of River Port Pilots Com'rs., supra,* the bellwether employment case, the Supreme Court dealt with a statute similar to Section 105 of the Maryland Code. Plaintiffs therein, ship pilots, contested a Louisiana statute allowing only state-qualified pilots to navigate seagoing vessels into New Orleans

harbor. The statute, in pertinent part, specified that a person could only become a state-qualified pilot after completion of a six-month apprentice program, which plaintiffs asserted was firmly under the pilot association's control. As a result, plaintiffs alleged that only family or friends of the incumbent pilots could ever become qualified to navigate ships into the harbor.[4]

After noting that pilots are essential to avoid traffic congestions and accidents and that pilotage is "a highly personalized" calling, the Court analyzed the problem:

> We are asked, in effect, to say that Louisiana is without constitutional authority to conclude that apprenticeship under persons specially interested in a pilot's future is the best way to fit him for duty as a pilot officer in the service of the State.

330 U.S. at 559, 67 S.Ct. at 914, 91 L.Ed. at 1098. The Court thereafter came to the following conclusion:

> The practice of nepotism in appointing public servants has been a subject of controversy in this country throughout our history. * * * We can only assume that the Louisiana legislature weighed the obvious possibility of evil against whatever useful function a closely knit pilotage system may serve. Thus the advantages of early experience under friendly supervision in the locality of the pilot's training, the benefits to morale and *esprit de corps* which family and neighborly tradition might contribute, the close association in which pilots must work and live in their pilot communities and on the water, and the discipline and regulation which is imposed to assure the State competent pilot service after appointment, might have prompted the legislature to permit Louisiana pilot officers to select those with whom they would serve.

> \* \* \* \* \* \*

The object of the entire pilotage law . . . is to secure for the State and others interested the safest and most efficiently operated pilotage system practicable. We cannot say that the method adopted in Louisiana for the selection of pilots is unrelated to this objective.

*Id.* at 563–64, 67 S.Ct. at 915–16, 91 L.Ed. at 1100.

Perhaps even a more striking case of the Supreme Court's application of this minimal review of state statutes can be found in *Railway Express,* where a New York City traffic regulation was contested in part as being in violation of the equal protection clause. The regulation in question prohibited the operation of any advertising vehicle on the streets, except those vehicles which displayed business notices or advertisements of the products of the owner and which were not used merely or mainly for advertising. Railway Express was convicted and fined for violation of the regulation because the advertising on its trucks was largely unconnected with its business. The transportation agency contended that: "one of the appellant's [Railway Express'] trucks carrying the advertisement of a commercial house would not cause any greater distraction of pedestrians and vehicle drivers than if the commercial house carried the same advertisement on its own truck." 336 U.S. at 109–10, 69 S.Ct. at 465, 93 L.Ed. at 538. In an opinion written by Mr. Justice Douglas, the Court held:

> That, however, is a superficial way of analyzing the problem, even if we assume that it is premised on the correct construction of the regulation. The local authorities may well have concluded that those who advertise their own wares on their trucks do not present the same traffic problem in view of the nature or extent of the advertising which they use. It would

---

**4.** Similar to the instant case, the river pilots contended that they were as fully qualified as persons chosen to be apprentices, in fact, the pilots in *Kotch* were accomplished pilots, with up to 15 years of previous piloting experience.

take a degree of omniscience which we lack to say that such is not the case. If that judgment is correct, the advertising displays that are exempt have less incidence on traffic than those of appellants.

We cannot say that the judgment is not an allowable one. Yet if it is, the classification has relation to the purpose for which it is made and does not contain the kind of discrimination against which the Equal Protection Clause affords protection.

336 U.S. at 110, 69 S.Ct. at 465, 93 L.Ed. at 538.

■ Consequently, since the rationale of the foregoing cases still obtain, this Court has no doubt that the low scrutiny rationality test is to be applied herein. We therefore turn to the second question presented, that of which definition of rationality is to be applied.

For many years the low scrutiny equal protection standard had never been specifically defined, but the cases offered an amalgam of reasoning out of which a principle emerged—that for a statute to be declared constitutional, it need only be shown that the statute was the type of statute a "rational" legislature could enact. See e. g., Kotch v. Board of River Port Pilots Com'rs., supra; Metropolitan

Casualty Ins. Co. v. Brownell, 294 U.S. 580, 55 S.Ct. 538, 79 L.Ed. 1070 (1934); Lindsley v. Natural Carbonic Gas Co., supra; Atchison T. & S. F. R. Co. v. Matthews, 174 U.S. 96, 19 S.Ct. 609, 43 L.Ed. 909 (1898). The Supreme Court in 1961, in McGowan v. State, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393, distilled the applicable precedent into what has since been cited as a generalized compendium setting forth the parameters of the theory:

> Although no precise formula has been developed, the Court has held that the Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. *A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.*

Id. at 425, 81 S.Ct. at 1105, 6 L.Ed.2d at 399 (emphasis added).[5]

5. Since McGowan was rendered it has been oft-cited as the stellar case concerning the rationality test. Since it is crucial to the within question to show the acceptance of McGowan, this Court will cite all the cases which accepted its rationale. Sosna v. Iowa, 419 U.S. 393, 420, 95 S.Ct. 553, 568, 42 L.Ed.2d 532, 552 (1975) (Marshall, J., dissenting); United States Dept. of Agri. v. Moreno, 413 U.S. 538, 534, 93 S.Ct. 2821, 2825, 37 L.Ed.2d 782, 787 (1973); San Antonio Indep. School Dist. v. Rodriguez, 411 U.S. 1, 51, 93 S.Ct. 1278, 1306, 36 L.Ed.2d 16, 53 (1973); Salyer Land Co. v. Tulare Lake Basin Water Storage Dist., 410 U.S. 719, 732, 93 S.Ct. 1224, 1231, 35 L.Ed.2d 659, 668 (1973); Weber v. Aetna Casualty & Surety Co., 406 U.S. 164, 181, 92 S.Ct. 1400, 1409, 31 L.Ed.2d 768, 782 (1972) (Rehnquist, J., dissenting); Lindsey v. Normet, 405 U.S. 56, 72, 92 S.Ct. 862, 873, 31 L.Ed.2d 36, 49 (1972); Bullock v. Carter, 405 U.S. 134, 142, 92 S.Ct. 849, 855, 31 L.Ed.2d 92, 99 (1972); Schilb v. Kuebel, 404 U.S. 357, 364, 92 S.Ct. 479, 484, 30 L.Ed.2d 502, 510 (1971); Graham v. Richardson, 403 U.S. 365, 372, 91 S.Ct. 1848, 1852, 29 L.Ed.2d 534, 541 (1971); United States v. Maryland Savings-Share Ins. Corp., 400 U.S. 4, 6, 91 S.Ct. 16, 18, 27 L.Ed.2d 4, 7 (1970); Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491, 501 (1970); Turner v. Fouche, 396 U.S. 346, 362, 90 S.Ct. 532, 541, 24 L.Ed.2d 567, 579 (1970); Kramer v. Union Free School Dist., 395 U.S. 621, 628, 89 S.Ct. 1886, 1890, 23 L.Ed.2d 583, 590 (1969); McDonald v. Board of Election Com'rs. of Chicago, 394 U.S. 802, 809, 89 S.Ct. 1404, 1408, 22 L.Ed.2d 739, 745 (1969); Shapiro v. Thompson, 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600, 614 (1969); Williams v. Rhodes, 393 U.S. 23, 51, 89 S.Ct. 5, 21, 21 L.Ed.2d 24, 43 (1968) (Stewart, J., dissenting); Rinaldi v. Yeager, 384 U.S. 305, 311, 86 S.Ct. 1497, 1501, 16 L.Ed.2d 577, 581 (1966) (Harlan, J., dissenting); Lucas v. Forty-Fourth Gen. Assembly of Colo., 377 U.S. 713, 752, 84 S.Ct. 1459, 1482, 12 L.Ed.2d 632, 581 (1964) (Stewart, J., dissenting); Baker v. Carr, 369 U.S. 186, 253, 82 S.Ct. 691, 729, 7 L.Ed.2d 663, 706 (1962) (Clark, J., dissenting).

Plaintiffs, however, contend that the Supreme Court in recent years has been retreating from the criteria outlined in *McGowan* and that a new equal protection test is emerging. They bottom this contention on an article written by Gerald Gunther which appeared in the Harvard Law Review, *In Search Of Evolving Doctrine On A Changing Court: A Model For A Newer Equal Protection,* 86 Harv.L.Rev. 1 (1972), wherein the author contended that the traditional standard (*McGowan*) was being, or should have been, replaced by a new standard—that the legislative means "substantially further" the legislative purpose of the statute.

After careful consideration of the article and thesis presented therein, this Court is of the opinion that, for two reasons, time has proven this theory invalid for our purposes. First, by Gunther's own choice of title, it must be recognized that the article deals with an evolving model, not an established or even an accepted model. The author hopes that his theory will appeal to and influence the changing mind of the present Court. Apparently, these expectations have not borne fruit: Gunther's theory, written in 1972, has not yet been adopted or even cited by the Supreme Court.[6] On the other hand, the Supreme Court has often cited *McGowan,* and its progeny (such as *Dandridge v. Williams,*

*supra* ),[7] as controlling any examination of regulations which do not impinge fundamental rights or establish suspect classifications. *Weinberger v. Salfi,* 422 U.S. 749, 769, 95 S.Ct. 2457, 2469, 45 L.Ed.2d 522, 541 (1975); *Fuller v. State,* 417 U.S. 40, 48, 94 S.Ct. 2116, 2122, 40 L.Ed.2d 642, 651 (1974); *Hagans v. Levine,* 415 U.S. 528, 541, 94 S.Ct. 1372, 1381, 39 L.Ed.2d 577, 590 (1974); *Ortwein v. Schwab,* 410 U.S. 656, 660, 93 S.Ct. 1172, 1175, 35 L.Ed.2d 572, 576 (1973); and *Jefferson v. Hackney,* 406 U.S. 535, 546, 92 S.Ct. 1724, 1731, 32 L.Ed.2d 285, 295 (1972).[8] It is patent, after a careful reading of these cases, that *McGowan* and/or *Dandridge* still establish the norm in cases involving economic regulations and stand as palpable evidence of the Court's rejection of Gunther's theory.

Secondly, plaintiffs cite a number of cases set forth in Gunther's article to buttress their contention that the standard is evolving; but these cases are inapposite to the instant case. While the cases cited by plaintiff illustrate situations wherein the Court declared the statute in question unconstitutional, the statutes in those cases were clearly dissimilar to the one at hand—*James v. Strange,* 407 U.S. 128, 92 S.Ct. 2027, 32 L.Ed.2d 600 (1972) [struck, on equitable grounds, statute allowing state to recover defense costs from indigents]; *Jack-*

---

**6.** The only time the article has been cited by the Court was by Justice Marshall, in *San Antonio Independent School District v. Rodriguez, supra,* 411 U.S. at 110, 93 S.Ct. at 1336, 36 L.Ed.2d at 53. There it was cited, not for Gunther's model, but to support the Justice's contention that the Court recently failed to acknowledge the true basis for certain of its more recent decisions.

**7.** At the infancy of the Burger Court, the Court, in *Dandridge v. Williams, supra,* amplified the rationale of *McGowan.* This case by the Burger Court soundly reaffirmed *McGowan* and allied cases:

In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some "reasonable basis," it does not offend the Constitution simply be-

cause the classification "is not made with mathematical nicety or because in practice it results in some inequality." *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369. "The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific." *Metropolis Theatre Co. v. City of Chicago,* 228 U.S. 61, 69–70, 33 S.Ct. 441, 443, 57 L.Ed. 730. "A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." *McGowan v. Maryland,* 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393.

397 U.S. at 485, 90 S.Ct. at 1161, 25 L.Ed.2d at 501.

**8.** See also note 5 *infra* for additional recent citations of Supreme Court cases applying *McGowan* and its progeny.

*son v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972) [struck commitment statute for incompetent criminal defendants since no reasonable basis shown]; *Weber v. Aetna Casualty & Surety Co., supra,* [workman's compensation statute denying equal recovery for dependent unacknowledged illegitimates stricken as having no legitimate state interest, compelling or otherwise]; *Humphrey v. Cady,* 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972) [remanded for hearing on renewal of commitment pursuant to Sex Crimes Act]; *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) [no basis for prohibition of distributing contraceptives to single persons]. *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971) [arbitrary statutory preference of males as estate administrators].

A perusal of these cases reveals, not a retreat from the rationale of *McGowan* or *Dandridge,* but a judicial recognition of the unusual circumstances presented to the Court in those cases. More importantly, none involve purely economic regulation as the one before this Court. Assuming, *arguendo,* that the court was fashioning a new intermediate standard somewhere between the rationality test and the compelling interest test, the instant case—a purely economic case—would not fall within the purview of such a rule.[9]

■ Therefore, since the applicable standard for the instant review is provided by *McGowan* and *Dandridge,* this leads to the third and final question—whether the statute satisfies the standard postulated therein. As quoted previously, *McGowan, inter alia,* mandates that the constitutionality of a statute turns on there being "any state of facts reasonably . . . conceived to justify it . . ." even if the law "results in some inequality. . . ." 366 U.S. at 425–26, 81 S.Ct. at 1105, 6 L.Ed.2d at 399. Consequently, it is incumbent upon this Court to determine whether the facts illustrate "any conceivable state of facts to justify" Section 105A of the Maryland Code.

At the October trial, plaintiffs' witnesses, in the aggregate, portrayed helpers as mature, knowledgeable, and dedicated workers;[10] they consistently rejected allegations proffered by the defendants that use of apprentices in lieu of helpers either increased safety, improved economy, or improved the product. One such witness, Mr. Albert C. Seeman, President of Association of Builders and Contractors of Maryland, testified that he believed a comparison of the progression of an apprentice and a helper would reveal that for a number of years the helper possesses greater skills. Generally, he testified, three or four years elapsed before the apprentice surpassed the helper in expertise. There-

---

9. Even Gunther admits, albeit with restraint, that his theory would not apply to a case such as this:

> The means-oriented scrutiny of this model would be applicable to a wide range of statutes, including the social and economic regulatory legislation that has been the most characteristic context for expressions of the hands off attitude of the last generation. The major limitation on the exercise of that scrutiny would stem from particularized considerations of judicial competence, not from broad a priori categorizations of the "social and economic" variety. That competence parameter to judicial intervention might be elaborated by refining an observation in Justice Stewart's majority opinion in *Dandridge v. Williams:*
>> [T]he intractable economic, social, and even philosophical problems presented by public

welfare assistance programs are not the business of this Court. . . . [The] Constitution does not empower this Court to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients.

Justice Stewart's is a justifiable concern when problems are truly "intractable": when the Court cannot confidently assess whether the means contribute to the end because the data are exceedingly technical and complex

. . . . .

Gunther, 86 Harvard L.Rev. at 23–24.

10. For example, Mr. Wiley Lawhead, International Representative of the Tile Helpers Union, described the average union member as a mature forty-two year old who worked with a high level of proficiency.

fore, plaintiff contends that during the early years of the worker's vocation the helper would produce a superior product, with more safety. Moreover, plaintiffs proffered testimony that certain jobs, especially in the tile and terrazzo field, were traditionally handled solely by the helper; that neither journeyman nor apprentice were qualified to perform specific aspects of a tile construction job.[11]

Defendants' witnesses on the other hand, categorically disputed plaintiffs' testimony concerning Section 105A and produced witnesses who testified that the use of apprentices rather than helpers was highly beneficial for numerous reasons. Much of the testimony centered around a comparison of the available formal apprentice instruction programs—union and non-union—with the absolute paucity of formal training available to the helper. The apprentice program was described as requiring attendance at up to two hundred classroom hours for as many as five years, with a comprehensive curriculum designed to examine in depth the multifarious phases and subtleties of the trade.[12]

In essence, defendants' witnesses testified that the end product of these extensive training programs was a well-rounded highly skilled journeyman able to function more efficiently, and more safely, at his trade than his untrained co-worker. The entire thrust of the testimony was that requiring apprenticeship inures to the benefit of all—the worker himself, his co-worker, and society as a whole.

In light of the evidence elicited, it is clear that defendants have satisfied the *McGowan* standard by establishing a set of facts which reasonably justifies the statute. A reasonable conclusion to be drawn from the evidence is that an extensively trained worker, should, on the whole, be a superior, more adept craftsman. The apprentice should be able to perform with more efficacy than the helper whose knowledge is limited by the extent of his on-the-job experiences, since the apprentice has the benefit of similar experiences *plus* knowledge gained in the classroom. Not limited to what he learns by osmosis, the apprentice should be more competent in all branches of the trade and be better able to utilize imagination, ability, and knowledge to produce a better product.

The testimony and arguments of counsel lead to three legitimate purposes which support the regulation contained in Section 105A:

1. Section 105A promotes a work product produced under safer working conditions.

---

11. Mr. Charles Habron, a helper of twenty-eight years, testified extensively to the distinctly separate functions and scope of responsibilities of the helper and the journeyman, in the tile field. Primarily, he stated, the journeyman's responsibility was to lay the tile, while the helper's was to prepare the materials (mix proportionally, etc.) and to finish the work after the journeyman was finished (grind, polish, etc.).

12. Mr. Bernard Carpenter, Training Director of the Union Steamfitters Training School in Maryland, testified at some length to the training and instruction offered under that program. Though the steamfitting course was somewhat atypical, due to the highly technical nature of that trade, the testimony illustrated the vast training received by apprentices. In that five-year program, the apprentices received two hundred and sixteen hours of classroom training per year, complemented with no less than sixteen hundred and seventy-five hours of on-the-job training. The array of books and instructional material was impressive, as it delved deeply into all aspects of the trade. Additionally, apprentices are subjected to rigid monthly testing on all phases of their instruction, including safety, and they must maintain a seventy percent average to remain in the program.

Mr. Carpenter's non-union counterpart, Mr. Charles Chamberlain, III, of the Association of Builders and Contractors, offered testimony of the typical non-union apprentice program. The witness described in some depth the four-year plumbing program offered, with its one hundred and forty-four classroom hours and its minimum requirement of two thousand on-the-job training hours per year. As the union apprentice program, this testimony illustrated a high quality program, wherein an apprentice could learn much about his trade.

2. Section 105A enhances the social conditions of the state by reducing unemployment and encouraging helpers to obtain skilled training which will increase their marketability.[13]

3. Section 105A promotes the welfare of the construction industry and the quality of the product by encouraging formalized apprentices training, the results of which are: (a) more skilled craftsmen of all-round competence, (b) more skilled craftsmen who are able to work without close supervision, and (c) more skilled craftsmen who are able to adapt to constantly changing work procedures.

These results, which are likely to flow from Section 105A, are palpably sufficient to pass *McGowan* scrutiny by clearly offering a legitimate purpose for the statute.

One further note, whether the foregoing results *actually* derive from the statute is irrelevant to the within examination, for it is not the function of this Court to weigh the statute's effectiveness. As the Supreme Court stated:

> We do not inquire whether this statute is wise or desirable, or "whether *it is based on assumptions scientifically substantiated.*" Misguided laws may nonetheless be constitutional. . . .
> Our task, however, is not to weigh this statute's effectiveness but its constitutionality.

*James v. Strange*, 407 U.S. 128, 132, 92 S.Ct. 2027, 2031, 32 L.Ed.2d 600, 605 (1972) (citations omitted and emphasis added).

Since this Court need only find "a conceivable state of facts" in justification of the statute to establish its constitutionality, and three valid justifications have been elicited, we declare Section 105A constitutional. It is a typical state regulatory statute, apparently reasonable, not arbitrary, which has a fair and substantial relation to the object of the legislation with all similarly situated persons being treated alike. *Royster Guano Co. v. Commonwealth*, 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989, 990 (1920). Consequently, since this statute passes constitutional muster, plaintiffs' request for declaratory judgment must be denied.

For the reasons set forth above, IT IS this 6th day of April, 1976, by the United States District Court for the District of Maryland, ORDERED as follows:

That plaintiffs' Petition for Declaratory Judgment BE, and the same hereby IS, DENIED.

WATKINS, Senior District Judge (dissenting):

To me, at least, a strong argument can be made that the right to try to earn a living is a fundamental right, associated with the right to the pursuit of happiness. I am persuaded, however, that under currently existing law (although no really comparable case is cited) the courts would probably apply the rationality test to state legislation restricting the availability of employment opportunities. I am also painfully aware of the broad language in *McGowan v. State*, 366 U.S. 420, 425, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393, 399, that:

> ". . . A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it."

The majority conceive that support may be found for Section 105A in the following "three legitimate purposes" in that it:

1. "[P]romotes a work product produced under safer working conditions."

2. "[E]nhances the social conditions of the state by reducing unemployment and encouraging helpers to obtain skilled training which will increase their marketability."

---

13. Though not specifically discussed previously, by increasing a worker's skill, the worker should become more marketable, thereby promoting the legitimate State purpose of reducing unemployment, as is alleged by defendants.

3. "[P]romotes the welfare of the construction industry and the quality of the product" by encouraging apprentice training resulting in (a) more skilled all-round competence; (b) more skilled craftsmen able to work without close supervision; and (c) more skilled craftsmen able to adapt to changing work procedures.

While I recognize that the function of the court is not to weigh a statute's effectiveness (*James v. Strange*, 407 U.S. 128, 133, 92 S.Ct. 2027, 2030, 32 L.Ed.2d 600, 606), its considerations "must be something more than an ingenious academic exercise in the conceivable." *United States v. Scrap*, 412 U.S. 669, 688–689, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254, 270.[1] I believe that the "conceptions" relied upon by the majority are, at the best, false pregnancies.

1. Safety.

(a) The Act itself, in addition to the absence of any reference to safety, contains self-destructive language with respect thereto.

(i) If safety is involved, why does the Act:

Not apply to public work jobs not exceeding $500,000;

Not apply to private construction, eight times greater than the covered public work.

If safety were a factor why does not the Act apply to all construction, protecting the construction workers, and the public (or private persons) using, or exposed to this "unsafe" construction.

(ii) The Commissioner of Labor and Industry testified that Section 105A[2] did not refer to safety, and that 105A was not needed for safety.

He further testified that helpers had been entirely satisfactory before the passage of 105A.

(iii) The Chief Construction Engineer and Inspector of Building Construction of the State of Maryland testified that he personally inspected 75% of building construction (other than schools), including pre- and post-105A construction, and public works under $500,000, and that the relative quality was "pretty uniform."

2. Reduce unemployment and encourage skilled training.

The effect of the Act is to increase unemployment, or to force the helper to work as a laborer. The testimony was uncontradicted that the average age of helpers was 42 years, and that the average age of apprentices was 23. The testimony also established that while a person over 30 might become an apprentice, this was exceptional, and the effort was to "try to hold down" to preferably 24 years.

It also was established that at least in the Terrazzo, Marble and Tile setting trade, some work could be done *only* by helpers; that mechanics were not allowed to do this type of work.

It was also established that some helpers do become journeymen.

3. Welfare of the industry and quality of the product.

Before considering the three subdivisions of this concept, it would seem almost conclusive against its validity to point out that the first witness called by defendants, the Training Director of the Steamfitters' Union, in response to a question as to whether he was familiar with Section 105A answered in the affirmative, and added that he was in favor of doing away with it.

---

1. *See, also, Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220, cited in *Kotch v. Pilot Commissioners*, 330 U.S. 552, 557, 67 S.Ct. 910, 912, 91 L.Ed. 1093, 1097 that a law is to be "tested by the language of the law there considered and the administration there shown."

*Railway Express v. New York*, 336 U.S. 106, 110, 69 S.Ct. 463, 465, 93 L.Ed. 533, 539:

". . . It is by such practical considerations based on experience rather than by theoretical inconsistencies that the question of equal protection is to be answered. . . ."

2. He further testified that 105A was not a "Department Bill," and that it was unfavorably reported by the Committee to which it had been referred.

Considering the majority concepts in order:

Promoting the welfare of the construction industry and the quality of the product by encouraging apprentice training.

The Commissioner of Labor testified that there was no basis for believing that elimination of helpers will improve the quality of work in public projects.

As noted above, the Chief Building Inspector testified that the relative quality of work before and after 105A, and on public works not exceeding $500,000, was pretty uniform.

Despite the fallacy of the major premise of promoting welfare in the construction industry, and quality of the product, a brief consideration must be given to the alleged benefits of encouraging apprenticeship training.

(a) More skilled all-around competence.

Perhaps after four years the all-around competence of an apprentice may exceed that of a helper. However, the competence of a helper was satisfactory in all construction before 105A, and is still satisfactory on public works not in excess of $500,000, and on all private construction.

(b) More skilled craftsmen able to work without close supervision.

The evidence was undisputed that the helper works behind his mechanic and "is told *what* to do, and *does it.*" (Emphasis supplied). The apprentice watches the journeyman and tries to learn what he does and how. At least at first the apprentice does less work on the job than a helper.

(c) More skilled craftsmen able to adapt to changing work procedures.

There was no evidence, offered or suggested, that helpers were not at least adaptable to changes.

To me 105A unnecessarily and unfairly discriminates against helpers. It has no fair and substantial relation to the (un-disclosed) object of the legislation, or even to the concepts sought to be conjured up by the majority.

I, therefore, respectfully dissent.