Steven AUGUSTUS, et al.

v.

Honorable "Buddy" ROEMER, et al.

Civ. A. Nos. 90–4667, 91–1441 to 91–1443.

United States District Court,
E.D. Louisiana.

July 16, 1991.

Samuel S. Dalton, Jefferson, La., and Jack L. Dveirin, New Orleans, La., for plaintiffs.

Dermot S. McGlinchey, J. Forrest Hinton and James M. Garner, McGlinchey, Stafford, Cellini, & Lang, New Orleans, La., for defendants Jefferson Parish Judges.

Patricia N. Bowers, La. Dept. of Justice, Office of Atty. Gen., New Orleans, La., for all other state defendants.

## ORDER AND REASONS

MENTZ, District Judge.

This matter came before the Court on the plaintiffs' motion for preliminary and permanent injunction. By stipulation the parties requested that the Court advance the trial on the merits and consolidate that trial with the hearing on the preliminary injunction. Also, by agreement the parties stipulated that this matter would be bifurcated insofar as the facial constitutional challenge would be heard and decided first, to be followed if necessary by a trial on the constitutionality of the challenged statutes as applied.

Accordingly, this matter was tried before the District Judge without a jury on June 5, 1991. All evidence was submitted by stipulated exhibits. No witnesses were called. Therefore, after reviewing the motion, the memoranda and arguments of counsel, the evidence adduced at the trial, the record and the law, the Court finds as follows for the reasons set forth below.

## FACTS AND BACKGROUND

Through the Louisiana Legislature, Orleans, Jefferson, and Terrebonne Parishes have enacted laws which impose a 2% charge on all commercial and property appearance bonds and a $20.00 charge on all recognizance bonds. The plaintiffs in these consolidated cases, each of whom was arrested and subjected to the 2% charge in one of the three parishes, challenge the constitutionality of these statutes under the eighth and fourteenth amendments to the United States Constitution pursuant to 42 U.S.C. § 1983. The respective statutes state in pertinent part:

[Orleans Parish]

§ 1384. Bail bond fee

A. In those parishes of five hundred thousand or more population, there is hereby imposed a fee on each bond issued which is conditioned upon the appearance of the defendant in a criminal matter, including cash, property, and appeal bonds, in the amount of two percent of the face value of the bond or twenty dollars, whichever is the greater amount. The fee is to be paid by the bondsman who issues the bail bond, unless otherwise provided herein. The fee shall apply to bail bonds for all criminal offenses, except traffic offenses and municipal offenses which may be tried in the municipal or traffic courts in such parishes. This fee is imposed for the purpose of funding the administration and forfeiture of such bonds.

B. The fee shall be paid by the defendant when a cash or property bond is posted. If the defendant is released on his own recognizance the fee shall be twenty dollars. When the court finds the defendant is indigent and entitled to have counsel appointed, the court may waive the fee on any bond that was not issued or posted by a professional bondsman.

C. The criminal district court for any such parish shall by court rule provide procedures for the timely collection, deposit, and accounting of the fee imposed by this Section. All fees collected shall be deposited in the criminal court cost fund of the criminal district court of any such parish.

La.Rev.Stat.Ann. § 13:1384 (West Supp. 1991).

[Jefferson Parish]

§ 994. Judicial expense fund for Twenty–Fourth Judicial District; established

B. (1) In addition to all other fees or costs now or hereafter provided by law, there is hereby imposed a fee on each bail bond issued which is conditioned upon the appearance of the de-

fendant in a criminal matter in the Twenty–Fourth Judicial District, including cash, property, and appeal bonds, in the amount of two percent of the face value of the bond or twenty dollars, whichever is the greater amount. The fee shall be paid by the bondsman who issues the bail bond, unless otherwise provided herein. The fee shall apply to bail bonds for all criminal offenses, except traffic offenses and ordinance violations which may be tried in courts of limited jurisdiction within the jurisdiction. This is imposed for the purposed of funding the administration of criminal justice, including the forfeiture of such bonds.

(2) The fee shall be paid by the defendant when a cash or property bond is posted. If the defendant is released on his own recognizance, the fee shall be twenty dollars. When the court finds the defendant is indigent and entitled to have counsel appointed, the court may waive the fee on any bond that was not issued or posted by a professional bondsman. The fee herein collected shall be refunded to the defendant if he is determined to be not guilty or if the charges are dismissed.[1]

(3) The judges, en banc, shall by local rule provide procedures for the timely collection, deposit, and accounting of the bail bond fee.

C. The clerk of court and the sheriff shall place all sums collected or received under this Section in a separate account to be designated as the Judicial Expense Fund for the Twenty–Fourth Judicial District Court. The judges, en banc, of the Twenty–Fourth Judicial District shall have control over the fund and all disbursements made therefrom. They shall cause to be conducted annually an audit of the fund and the books and where it shall be available for public inspection.

La.Rev.Stat.Ann. § 13:994 (West Supp. 1991).

[Terrebonne Parish]

## § 996. Judicial Clerk's Fund for Thirty-second Judicial District established

B. (1) In addition to all other fees or costs now or hereafter provided by law, there is hereby imposed a fee on each bail bond issued which is conditioned upon the appearance of the defendant in a criminal matter in the Thirty-second Judicial District, including cash, property, and appeal bonds, in the amount of two percent of the face value of the bond or twenty dollars, whichever is the greater amount. The fee shall be paid by the bondsman who issues the bail bond, unless otherwise provided herein. The fee shall apply to bail bonds for all criminal offenses. This fee is imposed for the purpose of funding the administration and forfeiture of such bonds.

(2) The fee shall be paid by the defendant when a cash or property bond is posted. If the defendant is released on his own recognizance, the fee shall be twenty dollars. If the court finds the defendant is indigent and entitled to have counsel appointed, the court may waive the fee on any bond that was not issued or posted by a professional bondsman.

(3) The judges, en banc, shall by local rule provide procedures for the timely collection, deposit, and accounting of the bail bond fee.

C. The clerk of court shall place all sums collected or received under this Section in a separate account to be designated as the Judicial Clerk's Fund for the Thirty-second Judicial District Court. The judges, en banc, of the Thirty-second Judicial District shall have control over and administer the funds and all disbursements made therefrom. They shall cause to be con-

1. The last sentence of subsection (2) was removed from the statute by 1990 La.Acts 72, effective September 7, 1990, and is the only difference between the current Jefferson Parish statute and the statute as it read prior to September 7, 1990. However, for purposes of this opinion, neither the addition nor the removal of this sentence would change the outcome of the ruling.

ducted annually an audit of the fund and the books and accounts relating thereto, and shall file the same with the office of the legislative auditor where it shall be available for public inspection.

La.Rev.Stat.Ann. § 13:996 (West Supp. 1991).

It is not contested that the charge must be paid or arrestees must promise to pay the charge as a condition to posting bail and being released. In all cases the 2% charge must be paid by the defendant, except in the case of commercial bonds. Where commercial bonds are used, the challenged statutes specifically require that the commercial bondsmen pay the 2% charge. However, it is uncontroverted that commercial bondsmen are presently passing the 2% charge on to their customer-arrestees, increasing the effective maximum rate now charged on commercial bonds from 10% to 12%. Finally, it is uncontested that the purpose of the three statutes is to help defray the costs of operating and administering bond forfeiture, and additionally in the case of Jefferson Parish, for the general administration of the criminal justice system.

## LAW AND DISCUSSION

### I. Introduction

■ Federal courts must avoid constitutional questions whenever possible. J. Nowak, R. Rotunda, J. Young, *Constitutional Law* (3rd Ed. West 1986) § 2.12(g) at p. 86–87 (citations omitted). This is particularly true in a case challenging the validity of a statute since there is a strong presumption that legislatures have acted constitutionally. *Id.* at p. 87. *See also McDonald v. Board of Election Commissioners of Chicago,* 394 U.S. 802, 808–09, 89 S.Ct. 1404, 1408–09, 22 L.Ed.2d 739 (1969) ("Legislatures are presumed to have acted constitutionally ... and their statutory classifications will be set aside only if no grounds can be conceived to justify them."); *United States v. Herrada,* 887 F.2d 524, 526 (5th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 2565, 109

L.Ed.2d 748 (1990). Furthermore, if possible the court should construe the questioned law so as to avoid the constitutional infirmity. *Pugh v. Rainwater,* 572 F.2d 1053, 1058 (5th Cir.1978) (en banc). However, a federal court should not shirk its responsibility to evaluate the constitutionality of a state statute where the jurisdiction of the federal court has been properly invoked. *See England v. Louisiana State Board of Medical Examiners,* 375 U.S. 411, 414–15, 84 S.Ct. 461, 464–65, 11 L.Ed.2d 440 (1964).

■ With a facial challenge to constitutionality, the proper inquiry is whether the mere enactment of the statute effects a constitutional deprivation. *Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 501–02, 105 S.Ct. 2794, 2800–01, 86 L.Ed.2d 394 (1985). A facial challenge is thus limited to the language of the statute. In that regard, the Supreme Court has stated:

> In evaluating a facial challenge to a state law, a federal court must ... consider any limiting construction that a state court or enforcement agency has proffered.

*Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494 n. 5, 102 S.Ct. 1186, 1191 n. 5, 71 L.Ed.2d 362 (1982).

### II. Is there a fundamental right to bail?

Plaintiffs in this case contend that there is a fundamental right to bail pursuant to the Eighth Amendment and that the three challenged statutes deny them this right. Therefore, plaintiffs maintain that we must apply the strict scrutiny standard of evaluation. In such a case, the state interest in enacting the questioned statutes must be compelling. The plaintiffs maintain that they should not be charged to exercise a fundamental right and that there is no compelling interest in raising revenue in this manner in order to support either the administration of the bond forfeiture system or the administration of the parish criminal justice system.

The defendants argue that there is no fundamental right to bail. As such, the Court is only required to evaluate whether

there is a rational relationship between the subject 2% bond fee statutes and a legitimate state interest. According to the defendants, the state has a legitimate interest raising revenue in order to fund the parish criminal justice system generally, and the bond forfeiture system specifically.

While plaintiffs maintain that the eighth amendment to the United States Constitution guarantees the right to bail, no explicit right to bail is mentioned in the text of the amendment:

> Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted.

U.S. Const. amend. VIII. The Supreme Court has never resolved this question.[2] And, although presented with the issue recently, the Court again avoided explicitly addressing whether there is a constitutional right to bail. See e.g., Murphy v. Hunt, 455 U.S. 478, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982) (per curiam). In Murphy, the Court found that because the petitioner had already been convicted of the offense his right to pretrial bail was moot. In dissent, Justice White expressed disappointment at the refusal of the Court to address the right to bail issue:

> If the Eighth Amendment is applied to the States and does not create an implied right to bail, then the State may not be able to categorically deny bail pending appeal in the manner Nebraska has cho-

sen. If conversely, there is no right to pretrial bail, a fortiori, Hunt would not be able to obtain release [post conviction and during appeal].

Id. at 487, 102 S.Ct. at 1186 (White, J., dissenting) (footnote omitted).

But, lower courts and commentators have continued to find support both for and against a right to bail.[3] In Stack v. Boyle, 342 U.S. 1, 72 S.Ct. 1, 96 L.Ed. 3 (1951), the Court noted that "[u]nless [the] right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning." Id. at 4, 72 S.Ct. at 3. Further, the Court recognized that "the function of bail is limited, the fixing of bail for any individual defendant must be based upon standards relevant to the purpose of assuring the presence of that defendant." Id. at 5, 72 S.Ct. at 4. In his concurrence, Justice Jackson added that if bail is set unusually high for the purpose of keeping the defendants in jail, "it would be contrary to the whole policy and philosophy of bail." Id. at 10, 72 S.Ct. at 6 (Jackson, J. concurring). However, Justice Jackson also noted "[t]his is not to say that every defendant is entitled to such bail as he can provide, but he is entitled to an opportunity to make it in a reasonable amount." Id.

Later that same term in Carlson v. Landon, 342 U.S. 524, 545, 72 S.Ct. 525, 536, 96 L.Ed. 547 (1952), the Court rejected a constitutional challenge to a denial of bail in a

---

**2.** Duker, *Right to Bail: A Historical Inquiry*, 42 Alb.L.Rev. 33 (1977). Mr. Duker states:

> The Court steadfastly had avoided the constitutional issue for one hundred sixty-four years. This was possible because there have been statutory guidelines for bail in existence for longer than the presence of the "excessive bail" clause in the Constitution.... The Court will not pass on a constitutional question, although properly presented by the record, if there is also present some other ground upon which the case may be disposed of. The rule has found most varied application. Thus, if a case can be decided on either of two grounds, one involving a constitutional or general law, the Court will decide only the latter.

> *Id.* at 89 and n. 334.

**3.** *Compare Hunt v. Roth*, 648 F.2d 1148 (8th Cir.1981), *vacated as moot sub nom. Murphy v.*

Hunt, 455 U.S. 478, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982) (per curiam) (eighth amendment implies a right to bail in certain circumstances) *with United States v. Giangrosso*, 763 F.2d 849 (7th Cir.1985), *cert. denied*, 475 U.S. 1031, 106 S.Ct. 1237, 89 L.Ed.2d 345 (1986) (eighth amendment is not implicated by the Bail Reform Act's provision dealing with detention pending appeal). *Compare also* Foote, *The Coming Constitutional Crisis in Bail*, 113 U.Pa.L.Rev. 959 (1965) (eighth amendment implies a right to bail) and Tribe, *An Ounce of Detention: Preventive Justice in the World of John Mitchell*, 56 Va.L.Rev. 371 (1970) (eighth amendment recognizes a right to bail) *with* Duker, *Right to Bail: A Historical Inquiry*, 42 Alb.L.Rev. 33 (1977) (eighth amendment does not imply a right to bail) and Meyer, *Constitutionality of Pretrial Detention*, (parts 1 & 2) 60 Geo.L.J. 1139, 1381 (1973) (no constitutional right to bail).

deportation proceeding. The Court observed:

> The bail clause was lifted with slight changes from the English Bill of Rights Act. In England that clause has never been thought to accord a right to bail in all cases, but merely to provide that bail shall not be excessive in those cases where it is proper to grant bail. When this clause was carried over into our Bill of Rights, nothing was said that indicated any different concept. The Eighth Amendment has not prevented Congress from defining the classes of cases in which bail shall be allowed in this country. Thus in criminal cases bail is not compulsory where the punishment may be death. Indeed, the very language of the Amendment fails to say all arrests must be bailable.

*Id.* at 545–46, 72 S.Ct. at 536–37 (footnote omitted). Since this deportation case, arguably a civil proceeding, legal scholars have vigorously debated the accuracy of the *Carlson* dicta. Professor Tribe states:

> The word "proper" is sufficiently ambiguous to beg the question involved here, and the bare majority in *Carlson*, in upholding the denial of bail to prevent sabotage by alien Communists pending deportation, indicated that it did not even regard the eighth amendment as clearly applicable to civil proceedings of the sort there involved. Given the majority's emphasis, however misguided, on Congress' special power over resident aliens in cases touching the national security, the opinion's brief remarks cannot be said to determine the reach of the excessive bail clause in criminal cases.... [T]he presumption of innocence of which the Supreme Court spoke in *Stack v. Boyle* represents [instead] ... a commitment to the proposition that a man who stands accused of crime is no less entitled than

his accuser to freedom and respect as an innocent member of the community.

Tribe, *An Ounce of Detention: Preventive Justice in the World of John Mitchell*, 56 Va.L.Rev. 371, 403–04 (1970) (footnotes omitted).[4] Dr. Meyer offers one of the opposing viewpoints:

> The only place where bail is mentioned in the United States Constitution is in the eighth amendment.... Obviously, it says nothing about a right to bail. It distinguishes neither between capital and noncapital cases, nor between bail before and after conviction. Therefore, it is not possible to read into it a guarantee of a right to bail before trial in noncapital cases without doing violence to the clear language of the Constitution.... the intent of the framers was to leave the matter to Congress. This conclusion is strengthened by the fact that only a few days after the final passage of the Bill of Rights in Congress—on September 21, 1789—and before its final adoption, Congress passed a statute—on September 29, 1789—in which it regulated the conditions of release on bail upon arrests in criminal cases.

Meyer, *Constitutionality of Pretrial Detention*, 60 Geo.L.J. 1139, 1179 (1973) (footnotes omitted).

In *Hunt v. Roth*,[5] however, Chief Judge Lay found that a right to bail exists by necessary implication. In the habeas corpus petition, the petitioner challenged a section of the Nebraska Constitution which denied bail to certain class of sex offenders. Recognizing that the right to bail is not absolute, the court stated:

> If the eighth amendment has any meaning beyond sheer rhetoric, the constitutional prohibition against excessive bail necessarily implies that unreasonable denial of bail is likewise prohibited.

---

**4.** Justice Burton suggested in his dissent in *Carlson* than not only does the eighth amendment prohibit excessive bail, it also implicitly prohibits the unreasonable denial of bail:

> The Amendment cannot well mean that, on one hand, it prohibits the requirement of bail so excessive in amount as to be unattainable, yet, on the other hand, under like circum-

stances, it does not prohibit the denial of bail, which comes to the same thing. The same circumstances are relevant to both procedures.

*Carlson*, 342 U.S. at 569, 72 S.Ct. at 549.

**5.** 648 F.2d 1148 (8th Cir.1981), *vacated as moot sub nom. Murphy v. Hunt*, 455 U.S. 478, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982) (per curiam).

Logic defies any other resolution of the question.

*Hunt,* 648 F.2d at 1157. Writing for the court, Judge Lay conceded that there might be instances where no amount of bail would protect the state's interests,[6] and that in such a case a court could consider relevant factors and deny bail:

> However, it is quite another thing to say that the eighth amendment would permit outright denial of bail without consideration of the factors relevant to an individual's suitability for pretrial release; at least in the eyes of the accused, an unreasonable and arbitrary *denial* of bail is surely the equivalent to an unobtainably high amount of bail that is set unreasonably and arbitrarily.

*Id.* at 1158. The court went on to find that the Nebraska procedures provided for no inquiry as to the dangerousness of the individual; rather, the state had merely made a legislative determination that a particular class of arrestees was not entitled to bail. The court held that the constitutional protections involved in the grant of pretrial release by bail are too fundamental to foreclose by arbitrary state decree. *Id.*

■ We agree with the well reasoned opinion in *Hunt v. Roth.* There is no *absolute* right to bail; however, there is a *limited* fundamental right to bail. That begs the question: How, or more precisely, when is the right to bail fundamental? There is no explicit mention of a right to bail in the eighth amendment, only the right to be free from excessive bail. But, how can there only be a right to be free from excessive bail, when alternatively a judge or a legislature may arbitrarily deny bail?

■ We believe the answer is basically a simple one. It involves a two step process. First, the accused has a fundamental due process right to have his or her *eligibility* for bail decided free from unreasonable individual determinations or arbitrary statutory classifications. And, second, once such a determination is made and bail has been set, the accused has a fundamental due process right not to be deprived of the opportunity to exercise the option to post bail and be released. We do not recognize an unqualified fundamental right to bail. Instead, we believe the framers intended to create fair access to the bail system for those who, after an individualized judicial determination, qualify for pretrial release. This notion of fair access corresponds with the wording of the eighth amendment itself and explains why the framers were apparently more concerned with excessive bail—bail set for the purpose of denying fair access to pretrial release—rather than with an absolute and unqualified right to bail.

This means that arrestees have a procedural due process right to have their eligibility for pretrial release on bail determined by an impartial decision maker. And, these procedures must be fundamentally fair. In other words, a statutory classification that is created for the purpose of denying pretrial release on bail to the affected class would be invalid without some provision for an individualized eligibility determination. That is not to say, however, that a court may not deny bail. It may indeed deny bail, but only when, in considering compelling state interests, it is found that the arrestee does not qualify for pretrial release.

■ The state interests in denying bail must be compelling because of the defendant's important liberty interests in obtaining pretrial release.[7] Therefore, in denying bail a court must consider only those interests that, when balanced against the interests of the community, weigh so heavily in favor of detention that the defendant's lib-

---

6. The most commonly cited interests include: (1) assuring that the accused will appear at the trial, *Stack,* 342 U.S. at 4–5, 72 S.Ct. at 3–4; (2) whether the accused will pose a danger to the community, *Carlson,* 342 U.S. at 538, 72 S.Ct. at 533; or (3) whether the accused will attempt to disrupt the administration of justice, for example, where an accused has threatened witnesses,

*Carbo v. United States,* 82 S.Ct. 662, 668–69, 7 L.Ed.2d 769 (1962).

7. Perhaps the most important liberty interests are the ability to effectively assist in the preparation of one's defense, and preventing the infliction of punishment prior to conviction. *Stack,* 342 U.S. at 4, 72 S.Ct. at 3.

erty interests are overcome.[8] As noted previously, three of the most often cited compelling reasons to deny bail include: assuring appearance at a public trial; dangerousness to the community; and obstruction of judicial administration.

■ Note, however, that each one of these three reasons is oriented to an individual case-by-case determination. Therefore, in order to be valid, a statute that creates a class for the purpose of limiting bail eligibility must also provide for a method of individualized determination citing a compelling reason or reasons when denying bail. *See, e.g.*, Bail Reform Act of 1984, 18 U.S.C. § 3141, *et seq.* (1988). For example, in a case involving the validity of the Bail Reform Act of 1984 under the eighth amendment, the Supreme Court stated:

> [The excessive bail clause] says nothing about whether bail shall be available at all.... While we agree that a primary function of bail is to safeguard the courts' role in adjudicating the guilt or innocence of defendants, we reject the proposition that the Eighth Amendment categorically prohibits the government from pursuing other admittedly compelling interests through regulation of pretrial release.... The only arguable substantive limitation of the Bail Clause is that the Government's proposed conditions of release or detention not be "excessive" in light of the perceived evil....
>
> In our society liberty is the norm, and detention prior to trial or without trial is

the carefully limited exception. We hold that the provisions for pretrial detention in the Bail Reform Act of 1984 fall within that carefully limited exception. The Act authorizes the detention prior to trial of arrestees charged with serious felonies who are found *after an adversary hearing* to pose a threat to the safety of individuals or to the community which no condition of release can dispel. The numerous procedural safeguards detailed above must attend this adversary hearing. We are unwilling to say that this congressional determination, based as it is upon that primary concern of every government—a concern for the safety and indeed the lives of its citizens—on its face violates either the Due Process Clause of the Fifth Amendment of the Excessive Bail Clause of the Eighth Amendment.

*United States v. Salerno*, 481 U.S. 739, 752–55, 107 S.Ct. 2095, 2104–06, 95 L.Ed.2d 697 (1987) (emphasis added). Although *Salerno* dealt with the constitutionality of a federal statute, we think this view is equally applicable by virtue of the fourteenth amendment to a state law or state constitutional provision. *See Robinson v. California*, 370 U.S. 660, 666, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758 (1962).

For example, as noted earlier in *Hunt v. Roth*, the Nebraska state constitution provided that bail would not be available to certain classes of arrestees.[9] However, that state constitutional provision did not

---

**8.** *See* Tribe, *supra* note 3, at 399. Mr. Tribe concedes that some governmental interests may justify the denial of pretrial liberty; however, he also notes the implicit constitutional necessity for an individual bail eligibility determination:

> It is plainly a *non sequitur* to conclude ... that the excessive bail clause leaves Congress entirely free to establish the circumstances under which pretrial release may be withheld.... Under [this] view, the excessive bail clause may be invoked by a defendant whose pretrial detention Congress has forbidden, and who claims that a judge is thwarting Congress's will by detaining him, but not by one whose pretrial detention Congress has required, and who claims that Congress had no valid reason to deprive him of his liberty. It makes no functional sense to give the clause this meaning, for the interests at stake,

both the government's and the individual's, are identical whether a legislature or a court has made the basic decision resulting in the defendant's pretrial imprisonment. Moreover, this reading would render the excessive bail clause superfluous, since the due process clause standing alone would forbid the judicial imprisonment of a man specifically entitled to release under the congressional "law of the land."

*Id.* at 399–400.

**9.** The pertinent section stated:

> All persons shall be bailable by sufficient sureties, except for treason, sexual offenses involving penetration by force or against the will of the victim, and murder, where the proof is evident or the presumption great. *Hunt*, 648 F.2d at 1151 (citing Neb. Const. art. I, § 9).

contain any procedure for an individualized eligibility determination, nor was there any record of the state court *sua sponte* having made such an individualized determination in Hunt's particular case. Holding the Nebraska constitutional provision invalid under the eighth amendment, the Eighth Circuit explained:

> It is sufficient to observe that the Nebraska procedures provide for no inquiry into the dangerousness of the individual, and no such finding appears in the record of this case. Instead, Nebraska has made a legislative determination that an entire class of accused persons is not entitled to bail.... [T]here exists a strong argument that bail may be properly denied without encroaching on constitutional concerns where a judicial officer weighs all the appropriate factors and makes a reasoned judgment that the defendant's past record demonstrates that bail will not reasonably assure his or her appearance or, arguendo, that he or she, because of the overall record and circumstances, poses a threat to the community. The fatal flaw in the Nebraska constitutional amendment is that the state has created an irrebuttable presumption that every individual charged with this particular offense is incapable of assuring his appearance by conditioning it upon reasonable bail or is too dangerous to be granted release. The constitutional protections involved in the grant of pretrial release by bail are too fundamental to foreclose by arbitrary state decree. The state may be free to consider the nature of the charge and the degree of proof in granting or denying bail but it cannot give these factors conclusive force.

*Hunt,* 648 F.2d at 1164–65 (footnote omitted).[10]

Therefore, we disagree with the plaintiffs in the present case that there is any implied absolute fundamental right to bail.

To imply such a right, in our opinion, would be to misconstrue what the framers intended—to guarantee an *individualized process* for determining each defendant's eligibility to be released on bail prior to trial. We also think that this approach addresses the concerns of those who insist that the text of the Bail Clause logically implies such a right. The argument goes: If the Bail Clause does not imply a fundamental right to bail then judges and legislatures, while constrained not to set bail unreasonably and excessively, may nonetheless deny bail altogether.[11] The first step under our approach, however, requires as a fundamental right an individualized case-by-case procedure to determine pretrial release eligibility. This procedural safeguard assures that judges and legislatures may not arbitrarily deny bail. Instead, they must provide and maintain a means whereby the individual defendant's liberty interests are balanced against the state's compelling interests in detaining that defendant.

The second step of the evaluation begins once the criteria for pretrial release have been weighed and a determination has been made that a particular defendant is eligible for pretrial release, *i.e.* he is not a flight risk, is not a danger to the community, and will not likely disrupt the administration of justice. This second step involves the Bail Clause itself and what we believe it actually implies. Once eligibility for pretrial release has been determined, the defendant has a *substantive* due process right to *access* the bail system. This implied right is fundamental because it would be unfair to deprive a defendant of access to a procedure for which he has already been determined to be eligible, especially where access to the procedure has a direct impact on his important liberty interests. *See* J. Nowak, R. Rotunda, J. Young, *Constitutional Law* (3rd Ed. West 1986), § 11.7 at p. 371 and nn. 22 & 23. Therefore, just as there is a fundamental right to have eligi-

**10.** *See also Pugh v. Rainwater,* 572 F.2d 1053, 1057–58 (5th Cir.1978) (en banc) ("We have no doubt that in the case of an indigent, whose appearance at trial could reasonably be assured by one of the alternate forms of release, pretrial confinement for inability to post money bail would constitute imposition of excessive restraint.").

**11.** *See United States v. Fah Chung,* 132 F. 109 (D.C.Ga.1904).

bility for pretrial release heard and determined, there is also a fundamental right not to be deprived of or unreasonably inhibited from exercising that right once it has been favorably determined.[12]

This notion of fair access to the criminal justice system as an implied fundamental right is not a new concept. For example, the sixth amendment guarantees a right to counsel; and, the Supreme Court has held that if a state does not provide the assistance of counsel to indigent defendants at any "critical stage" of a criminal case it will have violated that right to counsel.[13] The Supreme Court has also held that defendants may not be required to pay filing fees in order to have access to appellate courts [14] or as a requirement for post conviction relief following appeals.[15] Further, the Supreme Court has held that the state must provide transcripts needed for appeal to indigent defendants.[16] Additionally, the Supreme Court has required prison authorities to provide prisoners with adequate law libraries or adequate assistance from persons trained in the law in order to enable inmates to have meaningful access to the courts.[17]

■ Each of the plaintiffs in the present case was determined to be eligible for bail. Upon that determination, a fundamental right of access to that system attached. Therefore, in order for a statute to be valid that exacts a deprivation of that right, or charges money for the privilege of its exercise, the state must proffer a compelling interest. The state has offered two reasons why it implemented the challenged statutes: The first is to raise revenue to help defray the cost of running the criminal justice system in the three affected parishes; the second is to raise revenue to fund that specific portion of the criminal justice system that handles the administration of bond forfeitures.[18]

We are not unsympathetic to the situations in the three affected parishes. However, the need to raise revenue to run the criminal justice system is simply not a compelling enough reason to allow the deprivation of a fundamental right. The state should not be permitted to deny or inhibit or penalize access to a procedure it has already determined a defendant is eligible to use—the right to exercise the option of pretrial release on bail—especially where, as here, meaningful access to the bail system involves such important liberty interests. Therefore, based on the proffered state interests, we find that there is no way to construe the statute to avoid the constitutional infirmity.

12. The distinction must be made between the procedural due process right and the substantive due process right in order to distinguish the argument noted earlier—that the Bail Clause must imply a right to bail since it would make no logical sense for a judge to be prevented from assigning an excessive amount of bail, when alternatively the judge could deny bail altogether. The validity of a denial of bail in step one (procedural due process) turns on whether the relevant factors have been considered as a part of the individual's pretrial release eligibility determination, e.g., risk of flight, danger to the community, etc. The validity of a constructive denial of bail in step two (substantive due process) turns on whether the judge has set bail unreasonably high for the purpose of making the exercise of the right to pretrial release effectively impracticable. We believe for the reasons stated later in this opinion that constructive denial also occurs when the state assesses a tax or otherwise penalizes the arrestee for exercising the right to pretrial release.

13. *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

14. *Burns v. Ohio*, 360 U.S. 252, 79 S.Ct. 1164, 3 L.Ed.2d 1209 (1959).

15. *Smith v. Bennett*, 365 U.S. 708, 81 S.Ct. 895, 6 L.Ed.2d 39 (1961). Some of the cases involving indigent defendants were evaluated under an equal protection analysis. However, it is unnecessary to resort to equal protection analysis when the legitimacy of the law may be resolved by the substantive interpretation of a specific guarantee of the Bill of Rights. J. Nowak, R. Rotunda, J. Young, *Constitutional Law* (3rd Ed. 1986) § 14.41, at p. 785.

16. *Griffin v. Illinois*, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956); *Mayer v. Chicago*, 404 U.S. 189, 92 S.Ct. 410, 30 L.Ed.2d 372 (1971).

17. *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977).

18. We observe that another Louisiana statute also provides for administering the bond forfeiture system. See La.Rev.Stat.Ann. §§ 15:84–15:86 (West 1981 & Supp.1991).

### III. Is the 2% charge a "fee" or a "tax"?

The state also implores us to validate the challenged statutes, urging that the 2% charge is a "fee" which is incidental to a service provided to those benefiting from the administration of the bail system. Citing *Schilb v. Kuebel*, 404 U.S. 357, 92 S.Ct. 479, 30 L.Ed.2d 502 (1971), the state maintains that the 2% retention provisions are merely administrative in nature, that the charge is made to all arrestees, and that the charge is intended to cover the costs of safekeeping and administering bonds and sending out appearance notices and the like. The statute addressed *Schilb*, however, is entirely different from the statutes challenged in the present case.

In *Schilb*, the Supreme Court evaluated the validity of a cost retention statute stipulated to have been enacted for the purpose of reforming the traditional bail bond scheme. The Court noted:

Prior to 1964 the professional bail bondsman system with all its abuses was in full and odorous bloom in Illinois. Under that system the bail bondsman customarily collected the maximum fee (10% of the amount of the bond) permitted by statute ... and retained that entire amount even though the accused fully satisfied the conditions of the bond.... Payment of this substantial "premium" was required of the good risk as well as of the bad. The results were that a heavy and irretrievable burden fell upon the accused, to the excellent profit of the bondsman, and that professional bondsmen, and not the courts, exercised significant control over the actual workings of the bail system.

*Id.* at 359–60, 92 S.Ct. at 481–82 (footnote omitted). The Court also observed that the challenged statutes were intended to *reduce* the cost of liberty to arrested persons awaiting trial: "There is nothing in the statute which is intended to work any additional hardship on anyone in the giving of

bail." *Id.* at 363 n. 8, 92 S.Ct. at 483 n. 8. The Court explained that the stated purpose of the new statute, rectifying the abuses of the traditional bail bond scheme, were largely successful. Commercial bondsmen all but disappeared after the statute was enacted. *Id.* at 360, 92 S.Ct. at 482.

Essentially, though, what makes the challenged statute in *Schilb* different from the present statutes is that it gave the arrestee an *option.*[19] If he qualified for release on personal recognizance, there was no charge. If bail was set, however, the arrestee had a choice. He could choose to execute a bail bond and deposit 10% of the bail amount or $25 dollars, whichever was greater, with the clerk of court. When this method was used, and after the conditions of the bond were performed, 90% of the deposited amount would be returned to the defendant. The remaining 10% (or 1% of the total bail) was retained by the clerk "as bail bond costs." *Id.* at 360–61, 92 S.Ct. at 482–83 (footnote omitted).

The arrestee could, however, choose to execute a bail bond and secure it by depositing the full amount of the bail in cash, stocks and bonds, or by unencumbered real estate. When this method was used, and after the conditions of the bond were performed, the clerk returned the cash, stocks and bonds, or released the real estate *without charge or retention of any amount. Id.* at 361–62, 92 S.Ct. at 482–83 (footnote omitted) (emphasis added). In either case, though, bail was fixed by a judicial officer and the choice between the options was reserved to the accused. *Id.* at 362, 92 S.Ct. at 483. Noting the benefits of the new system and the lack of fundamental right deprivation, the Supreme Court refused to invalidate the challenged statute:

[W]e are not at all concerned here with any fundamental right to bail or with any Eighth Amendment–Fourteenth Amendment question of bail excessiveness. Our concern, instead, is with the 1% cost-

19. *See also Buckland v. Montgomery County of the Com. of Pa.*, 812 F.2d 146 (3rd Cir.1987) (a situation very similar to *Schilb* in which arrestees were offered the choice to participate in a county sponsored bail deposit program that would result in a much lower retained sum than if the arrestee were to use a commercial bondsman).

retention provision. This smacks with administrative detail and of procedure and is hardly to be classified as a "fundamental" right or as based upon any suspect criterion.

*Id.* at 365–66, 92 S.Ct. at 484–85 (footnotes omitted). Because the challenged statutes did not involve the deprivation of a fundamental right, and imposed little burden on those choosing the option while conferring benefits over the old system on those arrestees who chose to participate, the Court found the statute was not without a rational basis. *Id.* at 365–72, 92 S.Ct. at 484–88.

There are three important differences, however, between *Schilb* and the challenged statutes in the present case: voluntariness, proper statutory purpose narrowly tailored, and a benefit given in return for a fee charged. The state contends that the challenged statutes exact a "fee" in return for a benefit conferred. The Supreme Court has set forth the legal distinction between government charges which constitute a "fee" as opposed to a tax. In *National Cable Television Association, Inc. v. United States*, 415 U.S. 336, 340–41, 94 S.Ct. 1146, 1148–49, 39 L.Ed.2d 370 (1974), the Court held that in order for a monetary charge by a government to meet the legal definition of a "fee" the charge must be incident to a voluntary act and must confer a benefit. A government charge which is mandatory and does not confer a benefit is a tax. Therefore, a statute that authorizes taxing the exercise of a fundamental right cannot logically have been enacted for a proper purpose absent some compelling reason.[20]

■ First, as we have noted previously, once an arrestee is determined to be eligible for pretrial release, unencumbered access to the bail system is a fundamental substantive due process right. The statute in *Schilb* offered a choice and provided for a method by which the accused could avoid the retention charge if he so chose. Therefore, the statute did not inhibit the right of access to the bail system; if anything, the statute allowed *easier* access to the bail system. In the proceedings below in *Schilb*, the Illinois Supreme Court ruled that the statute did not result in an equal protection[21] violation because there can be no unconstitutional discrimination in the state system of bail release since each person accused has a choice of the method for obtaining pretrial release. Those who deposit 10% "are not automatically placed in this class ... by the law. They join only by the exercise of their own volition." *Schilb v. Kuebel*, 46 Ill.2d 538, 548, 264

---

**20.** *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (striking down a Virginia law that required voters to pay a $1.50 poll tax as a condition for exercising their right to vote in state elections); *Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (striking down as an impermissible infringement on the right to vote and the right to travel a law that required one year of residence as a condition for exercising the right to vote); *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974) (striking down as an impermissible infringement on the due process right of access to the courts a ban by the California Department of Corrections against students and paralegals conducting interviews with inmates); *Gardner v. Broderick*, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968) (holding that a state may not terminate a police officer for exercising his right not to incriminate himself when testifying before a grand jury); *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (finding that strict judicial scrutiny applies to state statutes which interfere with the exercise of a fundamental right).

**21.** Our treatment of this case has thus far excluded analysis under the Equal Protection Clause. That omission is purposeful and intended primarily to avoid confusion. However, a brief reference might now be helpful. In a case that involves the question of whether a statute infringes on a fundamental right, as in the present case, the deprivation may be properly analyzed under procedural and/or substantive due process. In addition, however, if the statute also creates a class of persons whose fundamental rights are infringed upon by operation of the statute, then equal protection is also implicated. The class created by the three statutes in this case, the arrestees in the three affected parishes, is not a "suspect" class. However, equal protection is implicated because the class created by the three statutes is improperly burdened by the infringement of their fundamental rights. In other words, for purposes of the present case, the only difference in analysis between due process and equal protection is individual versus class treatment. Thus, by this ruling we also find that the statutes violate the Equal Protection Clause.

N.E.2d 377, 382 (1970). In the present case, however, arrestees in the three affected parishes *are* automatically placed in a class by operation of the three statutes. They have no choice but to pay the 2% charge, promise to pay the 2% charge, or remain in jail.

Second, the stated purpose of the statute in *Schilb*, reforming the commercial bail bond scheme in order to make access to pretrial release easier, promoted access to the system and was narrowly tailored to that goal. The three statutes challenged in the present case do not promote access to the bail system. Instead, they exact a charge from those who want to exercise their right to access. And, the stated purpose of the three challenged statutes—raising revenue to support the criminal justice system—is not narrowly tailored.[22] Instead, the statutes create a class of persons who are charged for the privilege of exercising their right to pretrial release.[23]

Third, in *Schilb* the challenged statute without question conferred a benefit on

individuals who under the old system would likely have been charged a nonrefundable 10% of the bail amount by a commercial bondsman. The three statutes in the present case do not confer the benefit of easier access to the bail system.[24] On the contrary, the three challenged statutes inhibit access to the bail system. The state, however, argues that the statutes confer the benefits of safekeeping and such other administrative matters as sending out notices and the like. We fail to see, though, how requiring a bond to be posted and then charging a "fee" for safekeeping confers a benefit on anyone but the state. And, as to sending out notices, due process *requires* such notices be sent prior to hearings; therefore, charging someone for receiving due process is not proper regardless.[25]

## IV. Is it proper for the judges to control the 2% fund?

It is uncontested that the judges of Orleans, Jefferson and Terrebonne Parishes control their respective 2% bail bond funds.

**22.** Indeed, the alternatively stated purpose of raising revenue to administer bail bond forfeiture is covered by other statutes altogether. *See supra* note 17.

**23.** *See State ex rel. Leche v. Waggner,* 42 La.Ann. 54, 8 So. 209 (La.1890). In *Waggner* the Louisiana Supreme Court compared the sheriff's practice of demanding and receiving a $1.00 fee as a condition of release on bail to extortion. The court found equally extortionate the practice of requiring a promise to pay if the defendant could not actually pay at the time of release:

> [T]he legislature [did not] intend[ ] to authorize sheriffs to extort, in cash and in advance, one dollar from ... an accused person in a criminal prosecution ... as a condition precedent to the release of his person from custody.... It is certainly not a sufficient excuse for the [sheriff] to say that he has never denied any one his liberty "who said he would pay the charge." That he was willing to take a prisoner's verbal assurance does not alter the principle involved ... if a person under arrest should decline to make such promise, he would refuse him his liberty.

*Id.,* 8 So. at 211.

**24.** The plaintiffs also argue that the 2% charge is per se unreasonably excessive once bail has been set. To the extent that the 2% charge penalizes or taxes the exercise of the fundamental right to pretrial release once eligibility to release has been determined, we agree with the

plaintiffs that such a tax or penalty is per se excessive. However, if the *choice* of participation in a bail bond option program was offered and resulted in a tangible benefit to the arrestee, as in *Schilb* and *Buckland,* the state's retention of a small percentage of the deposit would *not* be per se excessive. What makes the 2% charge excessive in the present case is the infringement on liberty that results from the mandatory nature of participation—pay the charge, promise to pay the charge, or remain in jail.

**25.** To bolster its benefit argument, the state maintains that in the case of commercial bonds, it is the bondsmen who are responsible for paying the 2% charge since they are the ones receiving the benefits, *i.e.,* safekeeping bail and receiving court notices. The plaintiffs counter arguing that creating such a class of arrestees, who are not responsible for paying the 2% charge, is arbitrary and unreasonable if in all other types of bonds the arrestees are responsible for paying the 2% charge. Additionally, plaintiffs argue that in practice the bail bondsmen are simply passing the additional 2% charge along to the arrestee. We do not, however, pass on these arguments in this ruling since they are more concerned with the validity of the challenged statutes as applied, and the parties have stipulated that this portion of the case would only involve the facial constitutional challenge.

In Orleans, the statute provides that the criminal district court by local rule shall administer the collected sums. In Jefferson and Terrebonne, the statutes provide that the judges en banc shall by local rule administer the fund. We find that there is no practical difference in the way the three statutes are worded in this respect. By statute, the judges collectively in each parish are granted administrative authority over the funds.

Plaintiffs claim that the judges' control of these funds effectively denies due process. They rely primarily on *Tumey v. State of Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927), in which the Supreme Court held that it is a violation of due process under the fourteenth amendment for a judge to have a "direct, personal, substantial pecuniary interest" in a case. *Id.* at 523, 47 S.Ct. at 441. Tumey challenged a local ordinance, passed during Prohibition, which allowed a town to raise money through "liquor courts" from fines levied on convicted defendants. Part of the money raised from these fines went to the state, part to the town, part to pay the prosecutor, deputy, inspectors, and other employees, and a small amount went to the mayor/judge. The Supreme Court overturned Tumey's conviction because the judge had a "direct, pecuniary interest in the outcome, and because of his official motive to convict and to graduate the fine to help the financial needs of the village." *Id.* at 535, 47 S.Ct. at 445.

In opposition, the defendants cite and rely on *Dugan v. Ohio*, 277 U.S. 61, 48 S.Ct. 439, 72 L.Ed. 784 (1928) for the proposition that the judges' interests in the monies collected under the challenged statutes are too remote to create a due process problem. *Dugan* involved another municipal law which granted both judicial and executive power to the mayor/judge. The city was governed by a commission of five members, including the mayor, which exercised all legislative powers. The city manager, along with the commission, exercised all executive powers including control over the fees and fines collected as a result of prosecutions before the mayor/judge. The

Supreme Court held that the mayor's relationship, "as one of the five members of the city commission, to the fund contributed to by his fines as judge, or to the executive or financial policy of the city, is remote." *Id.* at 65, 48 S.Ct. at 440.

However, we also find instructive another more recent Supreme Court opinion, *Ward v. Village of Monroeville, Ohio*, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972). Like *Tumey* and *Dugan*, *Ward* involved a "mayor's court" where the mayor of a small town also acted as municipal court judge. Distinguishing between the kind and amount of executive control of finances exercised by the judges in *Tumey* and *Dugan*, the Court found that in *Tumey*

"[t]he fact the mayor there shared directly in the fees and costs did not define the limits of the principle. Although, 'the mere union of the executive power and the judicial power in him cannot be said to violate due process of law' ... the test is whether the mayor's situation is one 'which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the state and the accused....' "

*Ward*, 409 U.S. at 60, 93 S.Ct. at 83 (quoting *Tumey*, 273 U.S. at 534 and 532, 47 S.Ct. at 445 and 444). The Court went on to find that the actual test of whether a judge would be "tempted" is whether that judge exercises sufficient executive control over the finances and financial policy of the town to make him a potential partisan in order to maintain the level of the particular fund. *See id.*, 409 U.S. at 60, 93 S.Ct. at 83. Since the mayor/judge in *Ward* exercised sufficient executive control, the Court found the situation unlike that in *Dugan*. In *Dugan* the mayor/judge had only very limited executive control over the funds raised by fines and fees, and the little control he did exercise was diffused by the fact that he was only one member on the five-member commission which actually controlled the city's finances. *Id.* at 60–61, 93 S.Ct. at 83–84. In *Ward*, the Court held that because the judge exercised signifi-

cant financial control over the fines collected the defendant did not receive an impartial adjudication, and the Court overturned his conviction. *See id.* at 61–62, 93 S.Ct. at 83–84.

Therefore, even if this Court were not to find the challenged statutes unconstitutional under due process and equal protection as discussed above, we would nonetheless have to find them unconstitutional because they violate due process under *Ward.* The statutes themselves vest the judges with complete executive control of their respective 2% funds. Although no one contests that the judges do not receive direct compensation from the funds raised by the 2% charge, the judges regardless exercise or potentially exercise total control over the amounts collected.[26] The fact that the judges exercise joint control does not serve to diffuse the significance of their power over the funds since no non-judicial parties share in that control. As the state has noted both in both its written and oral arguments, an important purpose of the statutes is to raise revenue to help run the respective parish criminal justice systems. This plainly creates a temptation for the judges to forego due process and assess high bail amounts in order to maintain the level of funding necessary to run their respective criminal justice systems. Therefore, we find that this creates a "situation in which an official perforce occupies two practically and seriously inconsistent positions, one partisan and the other judicial...." *Tumey,* 273 U.S. at 534, 47 S.Ct. at 445.

Accordingly, for the reasons cited in this opinion,[27] the Court finds the three challenged statutes, La.Rev.Stat.Ann. §§ 13:1384, 13:994, and 13:996, constitutionally invalid on their face, and IT IS ORDERED that the plaintiffs' motion for a permanent injunction is GRANTED and the

state officers of Orleans, Jefferson, and Terrebonne Parishes are hereby respectively ENJOINED from enforcing those statutes as written.

---

26. *See* Burson, *Not Endowed by Their Creator: State Mandated Expenses of Louisiana Parish Governing Bodies,* 50 La.L.Rev. 635, 683–88 (1990) (discussing the problems in raising revenue in the manner contemplated by the present three statutes the writer states, "[t]he same constitutional objection [as in *Tumey v. State of Ohio* ] could be raised to the quality of criminal justice dispensed by district courts dependent solely upon fines and costs for their operating funds.").

27. The other reasons offered by the plaintiffs for invalidating the subject statutes are without merit or moot and, consequently, the Court expresses no opinion on them.